750 A.2d 677

**Hudson MAYBERRY, III**

v.

**BOARD OF EDUCATION OF ANNE ARUNDEL COUNTY.**

**No. 740, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

April 28, 2000.

688

Thomas J. Wohlgemuth, Annapolis, for appellant.

P. Tyson Bennett (Reese and Carney, LLP, on the brief), Annapolis, for appellee.

Argued before HOLLANDER, SALMON and BYRNES, JJ.

HOLLANDER, Judge.

This appeal has its genesis in an opinion and order issued by the Board of Education of Anne Arundel County (the "Local Board"), appellee, affirming the decision of the Superintendent of the Anne Arundel County Public Schools (the "Superintendent") to suspend Hudson Mayberry, III ("Hud-

son" or "Chucky"), appellant, a high school student. Thereafter, the Maryland State Board of Education (the "State Board") summarily affirmed the Local Board's order. Appellant subsequently sought review in the Circuit Court for Anne Arundel County, which upheld the State Board's decision. Hudson then noted an appeal to this Court and presents three questions for our review, which we have rephrased and reordered:

I. Did the State Board deprive appellant of his right to a hearing under COMAR 13A.01.01.03?

II. Did the Superintendent violate the requirements of Md.Code (1978, 1999 Repl.Vol.), § 7–305(c) of the Education Article ("E.A.") by "approving" a subordinate's actions?

III. Did the circuit court err by failing to articulate specific reasons for its ruling?

For the reasons that follow we shall affirm.

## FACTUAL BACKGROUND

In January 1997, Chucky began attending Northeast Senior High School in Pasadena, pursuant to a "Conditional Reinstatement Contract" dated January 23, 1997 (the "Contract").[1] The Contract was framed as a letter from Leslie Mobray, the Director of Student Services for the Anne Arundel County Public Schools, to appellant's father, Hudson Mayberry, Jr. ("Mr. Mayberry"). It read, in part:

---

1. According to a report admitted at the Local Board hearing, appellant "has a history" of being argumentative with teachers. The report indicated that this behavior led to appellant's "removal from Glen Burnie High School and his placement at Anne Arundel County Learning Center." Thereafter, in March 1996, appellant was expelled from the learning center as a result of a confrontation he had with a teacher. At the Local Board hearing, appellant's counsel attempted to limit the presentation of facts to those concerning the incident that led to appellant's suspension, and the facts surrounding the suspension itself. We focus our attention on those facts.

I have agreed to readmit [Hudson] to school at the Northeast High School for second semester under the following conditions:

1. Hudson will go to school each day that there is not a legal excuse for an absence.

2. Hudson will attend every class to which he is assigned unless excused by the teacher.

3. Hudson will complete and turn in all classwork and homework assigned to the best of his ability.

4. Hudson will pass a majority of courses attempted.

5. Hudson will be familiar with and obey all school rules at all times.

Failure to abide by these rules will result in Hudson's expulsion from the Anne Arundel County Public Schools. . . .

Both Hudson and Mr. Mayberry signed the Contract.

On Friday, April 4, 1997, appellant was involved in a verbal altercation with his physical education instructor, Brandt Schanberger. Roy Skiles, Northeast's principal, wrote a letter dated April 7, 1997 addressed to Mr. Mayberry. Mr. Mayberry testified at the hearing before the Local Board that he never received this letter. Nevertheless, the letter stated, in part:

[Hudson] has been placed on temporary suspension from school because he verbally assaulted a teacher on April 4, 1997. This is a violation of Board of Education policy 902.17 Assaults by Students and is also a violation of his Conditional Reinstatement Contract. . . .

My investigation of this incident indicates that this is a serious matter. Therefore, I am submitting a request to the Superintendent of Schools that Hudson be expelled from Northeast Senior High School.

Pursuant to [E.A. §] 7–305, the period of suspension begins on April 7, 1997 and continues until the Superintendent's designated representative concludes the investigation of this request. This process will include a conference with,

Leon Washington, Special Assistant [for Student Discipline] to the Superintendent which will take place on Monday, April 14, 1997 at 1:00 p.m. Although this conference is not a hearing, it will be an opportunity for you and your child to present any information or evidence which you believe to be relevant to the allegation against them [sic]. You may bring an advocate or other representative with you to assist you at the conference.

Skiles read the policy into the record at the Local Board hearing:

For the purposes of this policy, the term assault means any unprovoked attack upon or malicious act of violence against another person, any attempt to commit such an act or any threat to commit such an act, if that threat could reasonably cause the other person to believe he or she is in imminent danger of serious physical harm.

Thereafter, by letter dated April 17, 1997, Skiles asked the Superintendent to approve an "extended suspension"[2] for appellant, pending the completion of Washington's investigation. On April 25, 1997, Skiles sent the Superintendent a second letter that read, in part:

Mr. Washington concluded his investigation and met with Hudson Mayberry and Mr. Mayberry on April 25, 1997. Mr. Washington determined that Board of Education policy 902.17 was *not* violated by Hudson Mayberry. However, Mr. Washington found that Hudson Mayberry was in clear violation of his [Contract].

An extended suspension is requested pending the start of home teaching which will be Hudson's educational program for the remainder of the school year. An alternative educational placement for Hudson Mayberry for the 1997–98 school year is requested.

---

2. Although not defined by statute, the phrase "extended suspension" as used here indicates a suspension exceeding 10 days under E.A. § 7–305(c).

In a report dated April 28, 1997, Washington summarized the information he collected based on: (1) interviewing two adult witnesses and sixty-five student witnesses to the incident; (2) reviewing Hudson's academic and disciplinary files; and (3) holding a conference with Hudson, Mr. Mayberry, Hudson's grandmother, and Hudson's attorney. Based on his findings, Washington indicated that he concurred with Skiles's recommendation that Hudson's extended suspension continue until a home teaching program could be initiated. Washington further suggested that Hudson "seek outside counseling to assist him with anger management issues."

In accordance with Skiles's request for an extended suspension and Washington's recommendation, Mobray issued a letter to Mr. Mayberry on April 28, 1997 (the "Mobray Letter"), which stated, in pertinent part:

> This is to inform you that the Superintendent has approved Mr. Skiles' request. Accordingly, effective this date, Hudson is placed on extended suspension from Northeast High School pending the start of home teaching. Hudson will remain on home teaching until the end of the 1996–97 school term. An alternative placement will be sought for Hudson prior to the start of the 1997–98 school term.

As noted, Hudson appealed this decision to the Local Board. What follows is a brief summary of the evidence adduced at a hearing before a four-member panel of the Local Board on June 11, 1997.

On direct examination by the Superintendent's counsel, Schanberger was asked to recount the events that led up to the incident. According to Schanberger, appellant approached him on Wednesday, April 2, 1997, to inquire about appellant's grade in Schanberger's weight training class. Schanberger replied that appellant currently had a "D-." Hudson then asked if there were any way that he could improve his grade. Schanberger told Hudson that if he did all the work that was expected of him between then and the end of the marking period, he would give Hudson a "C." Hudson agreed.

Schanberger testified that Chucky failed to perform as promised. On Friday, April 4, 1997, when appellant again approached Schanberger to ask about his grade, Schanberger told appellant that because he had not fulfilled his end of the bargain, he would receive a "D" in the class. Hudson then "stormed out of the room."

Sometime thereafter, Hudson returned to class and subsequently joined a number of other students in the gymnasium's lobby to await dismissal. Schanberger stated that appellant began "talking very loudly" to another student, complaining about how Schanberger had reneged on his deal. Schanberger, who was between ten and fifteen feet away from appellant, told Hudson to give the other student "all the facts." Schanberger's description of what followed is illuminating:

[SCHANBERGER:] ... [Appellant] started getting verbally abusive with me. I can't remember the exact words he was saying, but he was saying things like, shut your mouth, mind your own business. A little later on he said something like, well, I'm going to beat you up and then the whole time I was talking in a normal manner. I wasn't being loud or anything, but I was saying, Chucky, tell him what the real facts are, tell him what the deal is.

Oh, just shut up, you know in that type of manner. And then when he said the last time that he was going to beat me up, you know, go ahead, if that's what you want to do, but tell him the facts. And then he stood up, threw his jacket off and stood right in front of me and kept saying, go ahead push me, why don't you hit me. Well, this whole time I was standing there with my hands in my pockets. I said, I'm not going to do that, Chucky, I have no reason to do that.

[SUPERINTENDENT'S COUNSEL:] What was the distance, if you can remember, between you and Chucky?

[SCHANBERGER:] Once he stood up, probably about a foot, foot and a half. And the whole time he kept saying things like, come on, old man, push me, you're afraid. You have no heart. And I kept repeating, and the whole time

with my hands in my pocket in a normal voice, I said, Chucky, I'm not going to do that. And he kept saying that, and eventually he said, I know where you live, I'll get you. . . .

Hudson testified that he believed he had completed all the requirements for Schanberger's class as of April 4, 1997. Consequently, he was dissatisfied with Schanberger's statement indicating that he would receive a "D." Appellant stated that after he heard his revised grade, he left class and attempted to speak to Craig Reynolds, Northeast's assistant principal, about the matter. Because Reynolds was evidently "too busy" to talk to appellant, Hudson then sought out Skiles. At Skiles's instruction, appellant said that he returned to class.

Appellant's recitation of what happened in the lobby of the gymnasium is relevant:

> [APPELLANT:] . . . [A]ll of a sudden Mr. Schanberger turns around to me and, I didn't say anything to him, he turns around to me and starts a conflict and starts yelling and talking about if I'm going to talk about something, talk about it right and this and that, and I told him that I wasn't talking to him, I'm talking to a friend, could you please leave me alone.

* * *

> [APPELLANT:] . . . And he still is going on, and he tells me that if I think I'm all big and bad, why don't I get up and do something, so I told him if he put his hands on me or give me a reason to do something, then I will and—
>
> [APPELLANT'S COUNSEL:] What did he say to you?
>
> [APPELLANT:] After I told him to put his hands on me that I will, he said, my job is not worth . . . losing over you and if you were in the streets I could show you something, or something like that. And I told him again that if he gives me a reason or puts his hands on me then I'll defend myself because I wasn't going to get kicked out of school for him, I knew I was under contract.

* * *

[APPELLANT:] ... [H]e kept saying stuff to me and kept egging me on, telling me, come on, come on, and everybody, all the kids around laughing.

[APPELLANT'S COUNSEL:] Where are his hands at this time?

[APPELLANT:] He's—so he's talking and I'm talking.

[APPELLANT'S COUNSEL:] Are his hands in his pockets?

[APPELLANT:] No, his hand is not in his pocket.

[APPELLANT'S COUNSEL:] Where are his hands?

[APPELLANT:] Actually he had a clipboard in his hand, so his hand couldn't be in his pocket, and every gym teacher in that school carries a clipboard.

[APPELLANT'S COUNSEL:] And what are his hands doing?

[APPELLANT:] I mean, he's talking. He's kind of upset so he's like he's directing, I mean, he's just talking, you know, when you talk sometimes you just, you know, like move your hands and you talk and that's what he's doing. His face is all red, he's made, he's angry at me because I'm talking to another student, telling the student that he lied and he didn't uphold what he told me he was going to do. He didn't stay by the deal.

On direct examination by the Superintendent's counsel, Skiles testified that Hudson had come to his office shortly before the incident. According to Skiles, appellant complained that there was a problem with his grade in Schanberger's class. Skiles told Hudson that he would schedule a conference with Schanberger and Hudson's parent, but told Hudson that he should return to class.

Approximately twenty minutes later, Skiles was advised that there was a disturbance in the gymnasium lobby. When he arrived in the lobby, he found a mass of nearly seventy students. Skiles testified that Hudson was identified as having been involved in the disturbance. Skiles quickly located appellant and advised him to go to the school's administrative

offices. Additionally, he asked Reynolds to begin collecting witness statements. At appellant's request, Skiles agreed to postpone interviewing Hudson until Mr. Mayberry could attend.

Skiles and Reynolds met with appellant and his father on Monday, April 7, 1997. The following colloquy is relevant:

[SUPERINTENDENT'S COUNSEL:] ... At that conference ... did you, in any way, discuss with them potential disciplinary action, potential allegations, or allegations, did you explain anything about what was going on in this case to the Mayberries [sic]?

\* \* \*

[SKILES:] ... I indicated to the Mayberries [sic] that there were serious allegations of misbehavior, that their son had committed a serious act that could be constituted as verbal assault and that that was in violation of, his manner was in violation of his [C]ontract ..., and I went through and proceeded to try to summarize for them the information that I had gotten from the teachers.

I read to them several, without using names, of the statements from the witnesses that I had, and then I gave them an opportunity to respond to those allegations.

[SUPERINTENDENT'S COUNSEL:] Them being the Mayberries [sic]?

[SKILES:] The Mayberries [sic] and Chucky in particular, to tell his side of the story and I took notes to try to capture, as best I could, what he had to tell me. At the conclusion of that, okay, I made the decision that there certainly was cause, that a serious discipline infraction had occurred, that it could well constitute verbal assault and by policy, a verbal assault is cause for a recommendation by the Superintendent for expulsion, and at that time, I placed—I gave them notice that he was going to be temporarily suspended from school for verbal assault in violation of his [Contract].

That, because this is a serious matter, our Board operates and has a separate investigation [by] the Special Assistant

to the Superintendent, that they would come out, that they would continue this investigation and continue the gathering of the information process, that they would have a hearing with the Special Assistant and that we would go from there. . . .

When asked about the April 7, 1997, meeting with Mr. Mayberry and his son, Reynolds responded that Skiles reviewed a number of witness statements with the Mayberrys and allowed both Hudson and Mr. Mayberry an opportunity to speak. Additionally, Reynolds said that Skiles explained to the Mayberrys that Hudson's conduct violated the Contract.

In an opinion and order dated August 27, 1997, the Local Board concluded that the Superintendent was justified in her decision to suspend Chucky. Hudson filed an appeal with the State Board on or about September 26, 1997. The Local Board subsequently moved for summary affirmance. By opinion dated March 25, 1998, and without a hearing, the State Board granted the Local Board's motion.

Appellant petitioned for review in the circuit court on April 24, 1998. Argument was heard on May 4, 1999, and the court affirmed the State Board by order filed May 19, 1999.

We will include additional facts in our discussion.

## DISCUSSION

### I.

Several important statutory principles arise in the adjudication of disputes within the public school education system. As to the powers and duties of the counties' superintendents, we refer to E.A. § 4–205(c)(1). That section states that, "[s]ubject to the authority of the State Board under [E.A. § 2–205(e)], each county superintendent shall explain the true intent and meaning of: (i) The school law; and (ii) The applicable bylaws of the State Board." A party that is dissatisfied with a county superintendent's decision, as appellant was in this case, may appeal to the county board of

education and, thereafter, to the State Board. *See* E.A. § 4–205(c)(3).

As intimated by E.A. § 4–205(c)(1), E.A. § 2–205(e) enumerates some of the State Board's powers. It provides:

> (1) Without charge and with the advice of the Attorney General, the State Board shall explain the true intent and meaning of the provisions of:
>
>> (i) [The Education Article] that are within its jurisdiction; and
>>
>> (ii) The bylaws, rules, and regulations adopted by the Board.
>
> (2) The Board shall decide all controversies and disputes under these provisions.
>
> (3) The decision of the Board is final.

Accordingly, our courts have recognized that the State Board generally has the last word on matters concerning the public school system. *See Board of Educ. v. Hubbard,* 305 Md. 774, 788, 506 A.2d 625 (1986); *Zeitschel v. Board of Educ.,* 274 Md. 69, 80, 332 A.2d 906 (1975); *Hurl v. Board of Educ.,* 107 Md.App. 286, 298, 667 A.2d 970 (1995). Moreover, it is well-established that judicial deference to the State Board's interpretation and application of statutes within its jurisdiction is appropriate. The Court of Appeals has observed:

> While administrative agencies generally may interpret statutes, as well as rule upon other legal issues, and while an agency's interpretation of a statute which it administers is entitled to weight, the paramount role of the State Board of Education in interpreting the public education law sets it apart from most administrative agencies.

*Hubbard,* 305 Md. at 790–91, 506 A.2d 625 (footnote omitted); *see Montgomery County Educ. Ass'n v. Board of Educ.,* 311 Md. 303, 309–10, 534 A.2d 980 (1987).

Our role in reviewing a decision of the State Board, as with any administrative agency, is identical to that of the circuit court. Thus, "we must review the administrative decision itself." *Westinghouse Elec. Corp. v. Callahan,* 105 Md.

App. 25, 32, 658 A.2d 1112 (1995); *accord Wisniewski v. Department of Labor, Licensing & Regulation,* 117 Md.App. 506, 515, 700 A.2d 860 (1997). An administrative agency's decisions are *prima facie* correct, and carry the presumption of validity. *Catonsville Nursing Home, Inc. v. Loveman,* 349 Md. 560, 569, 709 A.2d 749 (1998); *see Giant Food, Inc. v. Department of Labor, Licensing & Regulation,* 356 Md. 180, 185, 738 A.2d 856 (1999); *Wisniewski* 117 Md.App. at 516, 700 A.2d 860. We view those decisions in the light most favorable to the agency. *Giant Food,* 356 Md. at 185, 738 A.2d 856; *Catonsville Nursing Home,* 349 Md. at 569, 709 A.2d 749; *Wisniewski* 117 Md.App. at 516, 700 A.2d 860.

In sum, we need only determine: (1) whether the agency applied the correct legal principles, and (2) whether its findings are supported by substantial evidence. *Giant Food,* 356 Md. at 185, 738 A.2d 856; *Wisniewski,* 117 Md.App. at 516, 700 A.2d 860. "The test for determining whether the [agency's] findings of fact are supported by substantial evidence is whether reasoning minds could reach the same conclusion from the facts relied upon by the [agency]." *Department of Labor, Licensing and Regulation v. Hider,* 349 Md. 71, 78, 706 A.2d 1073 (1998); *see Department of Labor, Licensing & Regulation v. Woodie,* 128 Md.App. 398, 406, 738 A.2d 334 (1999); *Hernandez v. Department of Labor, Licensing & Regulation,* 122 Md.App. 19, 24, 711 A.2d 243 (1998); *Wisniewski,* 117 Md. App. at 517, 700 A.2d 860. If the agency's determination is reasonably supported by the evidence in the record, we must uphold the agency's determination although we may have come to a different result. *See Bulluck v. Pelham Wood Apartments,* 283 Md. 505, 515–16, 390 A.2d 1119 (1978); *Wisniewski,* 117 Md.App. at 517, 700 A.2d 860.

When an agency's decision is based on an erroneous legal conclusion, however, we will substitute our own judgment for that of the agency. *See Caucus Distributors, Inc. v. Maryland Securities Comm'r,* 320 Md. 313, 324, 577 A.2d 783 (1990); *Carriage Hill Cabin John, Inc. v. Maryland*

*Health Resources Planning Comm'n,* 125 Md.App. 183, 213–14, 724 A.2d 745 (1999); *see also Perini Services, Inc. v. Maryland Health Resources Planning Comm'n,* 67 Md.App. 189, 201, 506 A.2d 1207 ("When the issues in an action primarily involve questions of law, this Court must substitute its judgment for that of the agency if our interpretation of the applicable legal principles is different."), *cert. denied,* 307 Md. 261, 513 A.2d 314 (1986). Notwithstanding our deference to an agency's interpretation of a statute or regulation, the "substituted judgment standard" applies to the agency's statutory interpretation. *Carriage Hill,* 125 Md.App. at 214, 724 A.2d 745; *Rossville Vending Mach. Corp. v. Comptroller,* 97 Md.App. 305, 311–12, 629 A.2d 1283, *cert. denied,* 333 Md. 201, 634 A.2d 62 (1993); *see Perini Servs.,* 67 Md.App. at 201, 506 A.2d 1207 (acknowledging that the standard applies to COMAR).

Here, appellant contests the State Board's decision, alleging that the State Board "merely rubber-stamped" the Local Board's opinion and order. He argues that the State Board improperly denied him a hearing, in contravention of COMAR 13A.01.01.03. The Local Board posits that appellant is precluded from raising this issue because he failed to do so in the circuit court. Alternatively, the Local Board avers that the State Board's decision to rule in the absence of a hearing did not violate COMAR 13A.01.01.03.

 It appears that appellee's preservation claim has merit. Under Md. Rule 8–131, we will not ordinarily decide an issue "unless it plainly appears by the record to have been raised in or decided by the trial court." We find ourselves unable to determine conclusively, however, whether this issue was raised in or decided by the circuit court.

Appellant did not file with his appeal a transcript of the May 4, 1999, hearing before the circuit court. Consequently, this Court issued an order, dated October 22, 1999, instructing appellant to show cause why his appeal should not be dis-

missed pursuant to Md. Rule 8–411.[3] Appellant's answer to the show cause order was filed on November 5, 1999. In it, he pointed to the inclusion in the record of the transcript from the Local Board hearing. Additionally, he indicated that a transcript of the circuit court hearing was not prepared because the parties did not present additional evidence at that hearing. Rather, appellant explained that the hearing "consisted of oral argument only in support of memoranda filed by the respective parties." We subsequently ordered the appeal to proceed.

Appellant's allegations of error as to this issue are not contained in the memoranda filed in the circuit court, however. Moreover, the court's order of May 19, 1999, affirming the decision of the State Board, does not establish whether the issue was raised or decided. Assuming, *arguendo*, that the issue has been preserved, we perceive no error in the State Board's summary affirmance of the Local Board's decision without a hearing. We explain.

COMAR 13A.01.01.03, which governs appeals to the State Board, provides in relevant part:

E. Standard of Review.

(1) Decisions.

(a) Decisions of a county board involving a local policy or a controversy and dispute regarding the rules and regulations of the county board shall be considered prima facie correct, and the State Board may not substitute its judgment for that of the county board unless the decision is arbitrary, unreasonable, or illegal.

(b) A decision may be arbitrary or unreasonable if it is one or more of the following:

---

3. Maryland Rule 8–411(c) provides:

 **Filing and service.** The appellant shall (1) file a copy of the written order to the stenographer with the clerk of the lower court for inclusion in the record, (2) cause the original transcript to be filed promptly by the court reporter with the clerk of the lower court for inclusion in the record, and (3) promptly serve a copy on the appellee.

(i) It is contrary to sound educational policy;

(ii) A reasoning mind could not have reasonably reached the conclusion the county board reached.

(c) A decision may be illegal if it is one or more of the following:

(i) Unconstitutional;

(ii) Exceeds the statutory authority or jurisdiction of the county board;

(iii) Misconstrues the law;

(iv) Results from an unlawful procedure;

(v) Is an abuse of discretionary powers; or

(vi) Is affected by any other error of law.

(d) The appellant shall have the burden of proof.

\* \* \*

(4) Student Suspension and Expulsion.

(a) The decision of a county board in a student suspension and expulsion matter shall be final pursuant to [E.A. § 7–305(c)].

(b) The State Board may not review the merits of a student suspension or expulsion, but shall accept an appeal if there are specific factual and legal allegations of one or more of the following:

(i) The county board has not followed State or local law, policies, or procedures;

(ii) The county board has violated the due process rights of the student;

(iii) The county board has acted in an unconstitutional manner.

(c) The State Board may reverse or modify a student suspension and expulsion if the allegations set forth in § E(4)(b) are proven true or if the decision of a county board is otherwise illegal as defined in § E(1)(c).

(d) The appellant shall have the burden of proof.

\* \* \*

K. Motion for Summary Affirmance.

(1) The State Board may issue a decision on a motion for summary affirmance when there are no genuine issues as to any material facts.

(2) Briefs or memoranda in support of or in opposition to a motion for summary affirmance shall contain the following:

(a) A statement of the reasons upon which it is based;

(b) A statement of the facts;

(c) An argument which includes relevant State Board decisions, if any;

(d) A short conclusion stating the relief sought;

(e) Any supporting documents, exhibits, and affidavits.

(3) Parties shall make every effort to agree to a stipulation of facts and issues.

(4) Oral argument on a motion for summary affirmance may be scheduled before the State Board or hearing examiner as set forth in § L.

(5) A motion for summary affirmance may be decided by the State Board or hearing examiner without oral argument as set forth in § O(1) or (2).

\* \* \*

O. Disposition of an Appeal before Oral Argument or a Hearing.

(1) The State Board, in its discretion, may dispose of an appeal without oral argument or a hearing by:

(a) Stipulation;

(b) Settlement;

(c) Consent order; or

(d) Default.

(2) In addition to the provisions of § O(1), the State Board may render a decision in an appeal without an oral argument or hearing in an appeal that is not a contested case within the meaning of the State Administrative Procedure Act under the following circumstances:

(a) There are no genuine issues as to any material facts;

(b) The facts and arguments are adequately presented in briefs, motions, or other memoranda and pleadings.

(3) A motion to dismiss may be decided by the State Board or hearing examiner on the memoranda filed without oral argument.

Thus, under § O(2), the State Board was empowered to decide appellee's motion for summary affirmance without a hearing if (1) Hudson's appeal was not a "contested case"; (2) there were no genuine disputes of material fact; and (3) the facts and arguments were adequately presented in the memoranda filed with the State Board.

To determine whether Hudson's appeal was a "contested case," we must consider the definition of that phrase provided in Maryland's Administrative Procedure Act. Md.Code (1984, 1999 Repl.Vol.), §§ 10–201 to –226 of the State Government Article ("S.G."). The Act defines a "contested case" as an administrative proceeding to determine, *inter alia,* "a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing." S.G. § 10–202(d)(1)(i). Appellant has not referred us to, and we are not aware of, any statutory or constitutional principles that expressly or impliedly required a hearing in this case.

Moreover, it does not appear that the State Board was confronted with a genuine dispute of material fact. In the analogous area of summary judgment, a "material fact" is one that will alter the outcome of the case depending upon how the fact-finder resolves the dispute. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Keesling v. State,* 288 Md. 579, 583, 420 A.2d 261 (1980). In its opinion, the Local Board summarized the evidence presented at the hearing, and it is clear from that summary that the Local Board was cognizant of certain discrepancies between the varying accounts of the incidents. Although it took notice of the discrepancies, it did not rely on them in arriving at its conclusion, stating "[r]egardless of the motivation for Hudson's anger, the fact remains that Hudson's behavior in the gym lobby ... was

inappropriate, insubordinate, and disruptive." This finding led the Local Board to conclude that appellant violated the Contract's provision that Hudson "obey all school rules at all times" thereby justifying his extended suspension. In his appeal to the State Board, as well as his memorandum filed in the circuit court, appellant's principal argument was statutory and procedural. *See infra* § II. We are confident that no disputed material facts precluded the State Board's action here.

In addition, our review of appellant's notice of appeal to the State Board, appellee's motion for summary affirmance, appellant's reply to that motion, and the supporting documentation filed with those documents leave us satisfied that the issues were adequately presented. This case was ripe for summary adjudication by the State Board.

## II.

E.A. § 7-305(c) provides the process pursuant to which a student may be expelled or suspended for a period of time greater than ten days. It states:

(1) If a principal finds that a suspension of more than 10 school days or expulsion is warranted, he immediately shall report the matter in writing to the county superintendent.

(2) The county superintendent or his designated representative promptly shall make a thorough investigation of the matter.

(3) If after the investigation the county superintendent finds that a longer suspension or expulsion is warranted, he or his designated representative promptly shall arrange a conference with the student and his parent or guardian.

(4) If after the conference the county superintendent or his designated representative finds that a suspension of more than 10 school days or expulsion is warranted, the student or his parent or guardian may:

(i) Appeal to the county board within 10 days after the determination;

(ii) Be heard before the county board, its designated committee, or a hearing examiner, in accordance with the procedures established under § 6–203 of this article; and

(iii) Bring counsel and witnesses to the hearing.

(5) Unless a public hearing is requested by the parent or guardian of the student, a hearing shall be held out of the presence of all individuals except those whose presence is considered necessary or desirable by the board.

(6) The appeal to the county board does not stay the decision of the county superintendent.

(7) The decision of the county board is final.

Appellant complains that Washington, in conjunction with Mobray, effectively made the final decision through the Mobray Letter to suspend Chucky. Hudson avers, however, that E.A. § 7–305(c)(3) does not allow the Superintendent to delegate her responsibility to make a "finding" and, alternatively, that the Superintendent cannot simply approve a course of action recommended by one of her assistants.[4]

The Local Board responds that appellant's "strict interpretation" of E.A. § 7–305(c) creates "an absurd result." Appellee contends in its brief that it "defies logic and sense" to suggest that either the Superintendent or her designee may make the final decision to suspend or expel a student, but that

---

4. Appellant lodges the following "facts" in his brief:

Although the implication appears in the [Mobray Letter] that the superintendent had previously "approved" the action, there exists no record evidence that she in fact did so. The school authorities have never submitted testimony or other evidence of any kind as to any "approval" by the superintendent prior to or subsequent to Washington's final action of April 25, 1997. No testimony from the superintendent, correspondence, memorandum, or affidavit has ever been produced to attempt to corroborate and substantiate the Appellee's contention that the superintendent ever complied with the statute by: 1. making findings 2. after reviewing the investigation which "findings" were sufficient 3. to warrant the extreme action taken. The superintendent has never made an appearance in person or through any other method in this case. She did not appear at the appeal hearing at the [Local Board] and has never submitted anything to support the statements made by Washington in the April 28th letter of her "approval" as alleged.

the initial determination as to whether a longer suspension or expulsion is warranted must be made by the Superintendent. Moreover, at oral argument, the Local Board suggested that the General Assembly made a mistake by failing expressly to vest authority in a Superintendent's designee to impose a longer suspension or expulsion under E.A. § 7–305(c)(3). Appellee also argued that there is no reason for the Superintendent to be involved in the initial determination. We note that appellee does not rely on any legislative history to support its assertions.

In deciding what it understood as the issue before it, the Local Board stated that it believed the Superintendent possessed the power to delegate her responsibility to make findings pursuant to E.A. § 7–305(c)(3). It concluded, nonetheless, that "the issue does not exist in this appeal," because the Mobray Letter actually notified Mr. Mayberry of the Superintendent's decision; it did not purport to convey the decision of an assistant.

When confronted with the question, the State Board opined that the suspension procedure set out in E.A. § 7–305(c) had not been violated. It explained:

Hudson and his father had a prompt conference with the principal. Then, Mr. Washington, the superintendent's representative, conducted an investigation. Because Mr. Washington found a violation of the [Contract], he also held a conference that was attended by the Mayberrys and their attorney. After the conference, [Mobray] authored a letter which indicated that the local superintendent agreed that an extended suspension was warranted. At that time, Appellant was advised of his appeal rights. In light of the evidence in the record, Appellant has failed to illustrate a violation of due process based on the superintendent's delegation of responsibility.

As the excerpt from the State Board's opinion indicates, the State Board regarded appellant's allegation under E.A. § 7–305(c) as a due process claim within the purview of COMAR 13A.01.01.03E(4)(b). Indeed, appellant states in his brief to

this Court that failures below "to provide the procedural safeguards written into the law by the [L]egislature [have deprived him] of procedural due process."

Pointing to E.A. § 2–205(e)'s requirement that the State Board "explain the true intent and meaning" of the Education Article, appellee suggests that the State Board concluded that the initial determination under E.A. § 7–305(c)(3) may be made by either the Superintendent or her designee. Appellee also asserts that appellant "failed to illustrate a violation of due process based on the superintendent's delegation of responsibility." We disagree with appellee's analysis of the State Board's opinion. Accordingly, we shall briefly examine E.A. § 7–305(c). *See Montgomery County Educ. Ass'n v. Board of Educ.*, 311 Md. 303, 309–10, 534 A.2d 980 (1987) (discussing judicial deference to the State Board's statutory interpretation); *Board of Educ. v. Hubbard*, 305 Md. 774, 790–91, 506 A.2d 625 (1986) (same).

 The fundamental rule of statutory interpretation is the determination and effectuation of the intent of the Legislature. *See State v. Bell*, 351 Md. 709, 717, 720 A.2d 311 (1998); *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995); *In re Jason Allen D.*, 127 Md.App. 456, 475, 733 A.2d 351 (1999). To ascertain that intent, we first look to the actual language of the statute. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455 (1997); *Coburn v. Coburn*, 342 Md. 244, 256, 674 A.2d 951 (1996). If the statute's language is plain and its meaning is clear, we need not ordinarily look beyond the words of the statute itself. *Read v. Supervisor of Assessments*, 354 Md. 383, 393, 731 A.2d 868 (1999); *Kaczorowski v. Mayor and City Council of of Baltimore*, 309 Md. 505, 515, 525 A.2d 628 (1987). In deciding the plain meaning of a term, however, we may consult the dictionary. *State Dep't of Assessments & Taxation v. Maryland–Nat'l Capital Park & Planning Comm'n*, 348 Md. 2, 14, 702 A.2d 690 (1997); *Rouse–Fairwood Ltd. Partnership v. Supervisor of Assessments*, 120 Md.App. 667, 687, 708 A.2d 19 (1998).

Our review of E.A. § 7–305(c) reveals no ambiguity. The plain meaning of the statute mandates a series of steps that must be satisfied prior to a student's expulsion or extended suspension. First, a school principal who has determined that a student's actions warrant expulsion or extended suspension must submit a written report to the county superintendent. E.A. § 7–305(c)(1). Next, the county superintendent, or her representative, must investigate the matter. *Id.* § 7–305(c)(2). Thereafter, *if the county superintendent concludes that expulsion or extended suspension is warranted,* then the county superintendent, or her representative, must arrange a conference with the student and his or her parent/guardian. *Id.* § 7–305(c)(3). After the conference, either the county superintendent or her representative must make a "final" i.e., appealable, determination as to whether expulsion or extended suspension is warranted. *Id.* § 7–305(c)(4).

The statutory language of E.A. § 7–305(c)(3) makes clear that the Superintendent was required to make a "finding" as to whether appellant's extended suspension was justified. Thus, we agree with appellant that the Superintendent cannot assign responsibility to make such a finding. We disagree, however, with appellant's assertion that the Superintendent's approval of an assistant's recommendation does not satisfy the duty of the superintendent to make a finding under E.A. § 7–305(c)(3). The plain meaning of the statute's language does not support such a result.

According to *Black's Law Dictionary* 437 (6th abr. ed.1991), to "find" is "[t]o come upon by seeking or by effort. To discover; to determine; to locate; to ascertain and declare." A "finding" is defined, *inter alia,* as "[t]he result of the deliberations of a jury or a court. A decision upon a question of fact reached as the result of a judicial examination or investigation by a court, jury, referee, coroner, etc." *Id.*

In our view, it was reasonable for the Local Board, and implicitly the State Board, to conclude that the Superintendent found that an extended suspension was warranted after the investigation was complete. The statute does not require that the Superintendent personally conduct investigations or

write letters to parents. It merely requires her to consider the facts presented by her designees and to decide accordingly.

Nevertheless, if, as appellant suggests, the Superintendent failed to act "in accordance with the provisions of the law," we are confident that any defects in procedure under E.A. § 7–305(c) were purged by the *de novo* evidentiary hearing before the Local Board. *See Board of Educ. v. Crawford,* 284 Md. 245, 259, 395 A.2d 835 (1979) (holding that a subsequent *de novo* administrative hearing by the State Board cured the due process defects in Board of Education of Charles County hearing); *Board of School Comm'rs v. James,* 96 Md.App. 401, 434, 625 A.2d 361, *cert. denied,* 332 Md. 382, 631 A.2d 452 (1993). As we said in *Miller v. Board of Educ.,* 114 Md.App. 462, 690 A.2d 557 (1997): "In the school discipline context, procedural due process require[s] only that the student be provided with (1) notice of charges against [him] and (2) a chance to explain [his] version of the contested event." *Id.* at 470, 690 A.2d 557 (citing *Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975)).

In his brief, appellant argues:

One serious possibility exists in this case if the [S]uperintendent had acted in accordance with the provisions of the law. She (as did the investigator and the board of education itself) *may* have disagreed with the request of the principal or the final determination of the assistant who rejected one of the principal's two charges against appellant and as the board of education itself determined to expel rather than suspend the appellant contrary to the recommendations of both the assistant and the investigator. The [S]uperintendent, after a conscientious review of the report and a conference with the parent and student, *may* have made findings that would not warrant the extended suspension levied; but it will never be known whether she would have done so or not.

(Emphasis added).

In light of the above, what the Superintendent *may* have done is largely irrelevant. In this case, appellant had notice of

his hearing before the Local Board and was represented by counsel at that hearing. He was able to present evidence, examine his own witnesses, and cross-examine those witnesses called by the Superintendent. Appellant was able to create a complete record, one that he relied upon in seeking judicial review in the circuit court, and in noting his present appeal. We perceive no violations of procedural due process.

## III.

 Finally, appellant challenges the circuit court's order, filed on May 19, 1999, claiming the court did not articulate the specific reasons for its ruling. Appellant contends that the court's failure to articulate specific reasons for its ruling constituted error under Md. Rule 2–522 and established case law. Appellee disagrees, stating that appellant's reliance on these authorities is "misplaced."

The order provides:

This matter came before this Court on May 4, 1999 for a hearing on the Appellant's Petition for Judicial Review. Having considered the arguments of both parties, it is this 4th day of May, 1999, by the authority of the Circuit Court for Anne Arundel County, State of Maryland,

**ORDERED** that the decision of Maryland Board of Education is hereby AFFIRMED.

The court then offered the following explanation in a footnote:

Decisions of administrative agencies "carry with them the presumption of validity" and "will not be disturbed on review if the record shows substantial evidence to sustain the findings." *Dickinson–Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel County,* 273 Md. 245, 256, 329 A.2d 18 (1974). Furthermore, the State Board of Education "has the 'last word' on controversies or disputes involving the proper administration of the public school system, thereby leaving the courts of this State with limited power to interfere." *Hurl v. Board of Educ.,* 107 Md.App. 286, 298, 667 A.2d 970 (1995). Upon review of the record in the present case, this Court is satisfied that there was

substantial evidence to support the finding of the Board. Consequently, the finding of the Board is affirmed.

Maryland Rule 2–522(a) provides that, "[i]n a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages." In *Kirchner v. Caughey,* 326 Md. 567, 573, 606 A.2d 257 (1992), the Court of Appeals reasoned that the rule "applies to a final judgment in every non-jury action, whether legal or equitable in nature." In *Boswell v. Boswell,* 352 Md. 204, 223, 721 A.2d 662 (1998), the Court suggested that the rule requires the trial court to (1) state an objective to be served by its decision, and (2) describe the facts that advance that objective. (Citing *Boswell v. Boswell,* 118 Md.App. 1, 31, 701 A.2d 1153 (1997), *aff'd,* 352 Md. 204, 721 A.2d 662 (1998)).

Appellant has placed considerable emphasis on our opinion in *Willow Grove Citizens Ass'n v. County Council of Prince George's County,* No. 1611, Sept. Term 1998 (filed Oct. 5, 1999) (unreported). Appellant's reliance on *Willow Grove* contravenes the express language of Md. Rule 8–114(a), which provides that an unreported opinion of this Court "is neither precedent within the rule of stare decisis nor persuasive authority." [5]

We are confident that the circuit court considered the record before it and was able to come to a reasoned conclusion. Unlike the appeals in *Boswell* and *Kirchner,* which involved the interests of children in family matters, the circuit court in this case was functioning in a reviewing capacity. Included in the record before it were, notably, the opinions of two separate agencies within the public education system. The circuit court was required to review the State Board's decision and determine: (1) whether the agency applied the

---

**5.** Moreover, we note that *Willow Grove* arose out of a zoning dispute involving Md.Code (1957, 1997 Repl.Vol.), Art. 28 § 8–123. Even if the case could qualify as persuasive authority, it would have no bearing on this case.

correct legal principles, and (2) whether its findings were supported by substantial evidence. *Cf. Wisniewski v. Department of Labor, Licensing & Regulation,* 117 Md.App. 506, 515–16, 700 A.2d 860 (1997). In our view, the court's order evidences that the court fulfilled its obligations.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**