768 A.2d 112

**MONTGOMERY COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,**

v.

**P.F.**

**No. 0584, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

March 6, 2001.

244

Sandra Barnes, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellant.

Brian D. Wise, Rockville, for appellee.

Argued before MURPHY, C.J., and ADKINS and WILLIAM W. WENNER (Retired, Specially Assigned) JJ.

ADKINS, Judge.

This is the story of a father who successfully defended himself against accusations that he molested his three year old daughter. It underscores the importance that a thorough, unbiased investigation can play in protecting both children and parents.

The Montgomery County Department of Health and Human Services ("MCHHS"), appellant, asks us to overturn an order reversing its finding that P.F., appellee ("Mr.F."), sexually abused his child. The order also prevented MCHHS from entering Mr. F.'s name into a central registry reporting child abuse cases in which MCHHS has made a finding that abuse was either "indicated" or "unsubstantiated," and required MCHHS to expunge from its records any references to Mr. F. as a suspected abuser. An administrative law judge issued the order after finding that "there is no credible evidence that an incident of sexual abuse occurred...." The circuit court agreed, and affirmed the administrative order.

In this appeal, MCHHS argues that the administrative law judge and the circuit court erred by failing to treat the expert testimony of its social worker and the out of court statements of the child as credible evidence that Mr. F. abused his daughter. We shall affirm the judgment, because (1) the social worker's opinion that the child had been molested merely vouched for the child's credibility, and (2) the administrative law judge's threshold determination that the child's hearsay statement was not reliable enough to constitute credible evidence of abuse was supported by the evidence.

## FACTS AND LEGAL PROCEEDINGS

On August 4, 1998, MCHHS received a confidential report concerning the possible sexual abuse of a three year old child whom we shall refer to as "Susan." Susan's parents, Mr. F. and E.F. ("Ms.F."), are divorced. The reporter was Mr. F.'s therapist. She alleged that after Mr. F. spent a recent day with Susan, he became concerned that someone, such as a babysitter, may have molested her. According to notes in MCHHS's file, the therapist said that Mr. F. told her that his fears arose when he went to change Susan's diaper, and she asked him if he was going to "tickle her pee-pee." He was worried why a young child would ask such a question. The therapist told Mr. F. that she felt legally obligated to report his concerns, and advised him to inform Ms. F. Mr. F. said that when he told his ex-wife that his therapist was making a report, she became angry and told him that he had just lost his visitation privileges.

### Police And MCHHS Investigation

One of MCHHS's social workers, Ann Marie Gumula, began her investigation by telephoning both Mr. F. and Ms. F, and then meeting with both parents and the child. Gumula and a police detective, Ralph Penn, Jr., interviewed first Ms. F. and Susan, and later Mr. F. This turned out to be the investigators' only contact with Susan.

Penn and Gumula prepared separate case reports. Penn's report, dated August 21, 1998, both opened and closed the

police department's investigation. Penn first summarized the therapist's report, which was related to him by MCHHS. Mr. F. reported to his therapist that his ex-wife told him that Susan had said that Mr. F. had hurt her "pee pee" with his finger. According to the report, Mr. F. also told the therapist that "while changing [Susan's] diaper she asked him if he was going to tickle her pee-pee. Mr. [F.] told his daughter that daddies don't tickle their daughter's pee-pee."

Penn's report then summarized the interviews with Ms. F., Susan, and Mr. F. According to Penn, Ms. F. reported that she had heard Susan complain about her father hurting her on two occasions.

On 08–05–98, the writer along with Ann GUMULA met with [Ms. F.] and her daughter [Susan] . . . Mrs. [F.] stated that Mr. [F.] had called her the day before to tell her that he had talked to his psychiatrist about their daughter's request that he tickle her pee-pee. Mrs. [F.] stated that she now remembers her daughter saying something to her the evening of her trip to the aquarium about her father hurting her. She said that she could not recall if her daughter said that he hurt her from wiping her or with his finger. She also said that her ex-husband has never been able to wipe [Susan] adequately.

Mrs. [F.] stated that the following Friday when her ex-husband came to visit, [Susan] told him either my pee-pee hurt or you hurt my pee-pee. Mrs. [F.] also said that she has never heard her daughter say to her father "are you going to tickle my pee-pee?"

Penn then summarized the interview with three and a half year old Susan.

[Susan] . . . was able to identify a chart of animals, and was able to correct the writer when the animals were misidentified. . . . When asked to identify a body part's chart [Susan] was able to correctly identify. She referred to the vaginal area of her body as her "pee-pee" . . . .

When asked if her mother has talked to her about people not touching her, [Susan] said "yes". When asked if any-

body touched her that she didn't like, she said "no". When asked if people wiped her in the bathroom, [Susan] said, "No I wear pants." And when asked if anyone had hurt her pee-pee, the girl answered Mom. When asked where, she said at home.

[Susan] was asked if anyone had tickled her pee-pee, she answered "no". And when asked if her Daddy tickled her pee-pee, the girl said, "No, he put his finger inside my pee-pee." The girl said that it happened at Uncle McDonald's, which is what she calls McDonald's restaurant. She stated that her father was carrying her in his arms, outside of the McDonald's going in. When asked if it hurt, the girl replied that it did. And when asked if her father had stuck his finger under her pants the girl again said, "yes", and when asked if her father put his finger inside her pee-pee she again said, "yes, inside".

The girl was again asked by her interviewers to tell them one more time, "What did daddy do?". She said, "He put his finger inside my pee-pee." When asked where, she said "at Uncle McDonald's". When asked, in the bathroom? She said, "No, I told you he was carrying me—outside". She was asked if she went to the bathroom at Uncle McDonald's, she said, "Yes". And when asked if her daddy had wiped her, her response was "yes". The girl was then asked if this was when he put his finger inside her pee-pee. Her answer was, "No. It was outside Uncle McDonald's—I told you".

Penn also summarized the meeting he and Gumula had with Mr. F. three days later.

Mr. [F.] adamantly denied ever touching his daughter other than to wipe her after she used the bathroom. He described to the writer what he had done with his daughter on the day he took her to the Baltimore Aquarium. Mr. [F.] stated that he picked his daughter up from her mother's home on Friday, June [sic] 24th and they drove to the McDonald's drive-thru.... From there they went to a park.... He said while at the park his daughter informed him that she had to "pee", so he let her squat in the grass.

Mr. [F.] stated that after doing so he wiped his daughter with napkins he had gotten from McDonalds.

After leaving the park, Mr. [F.] said that he and his daughter drove to the Baltimore Aquarium. He said at some point his daughter had to "pee," and he took the girl to the men's room. He said that he asked his daughter if he [sic] wanted him to wipe her and she said, "yes". Mr. [F.] stated that sometime that morning his daughter asked him, "Will you tickle my pee-pee?" Mr. [F.] said that he told his daughter that daddy's don't do that. Mr. [F.] stated that the following Monday he went to his therapist, because he sought guidance on how to deal with his daughter's state- ment. He said that he would not have talked to his therapist about this if he had known that she had an obligation to report it.

Mr. [F.] stated that he knows that he [1] has anger issues, but he's not going to buy into being set up for hurting his daughter sexually. He said that he was not going to admit complicity or guilt in doing anything to his daughter.....

Penn noted that on August 20, 1998, he "reviewed this case with the State's Attorney's Office, who elected not to proceed, thus closing the case by exception."

Ms. Gumula made a series of notes and summary reports during the course of her investigation for MCHHS. She made both handwritten and typewritten notes dated 8/5/98 from her meeting with Susan. The complete text of her typewritten note is as follows:

Went through charts of animals and she correctly identified them. Corrected me when I misidentified them. Would not change her identifications (which were right.)

Wanted her mother—told her mother in bathroom—said she'd be in when she came back. She didn't want to do the charts any more but did a second. Fish—said saw in Aquarium. Who took her? Dad.

---

1. Gumula's handwritten notes indicate that Mr. F. stated that he "knows *[Ms. F.]* has anger issues...." (Emphasis added.)

Went into body parts chart. Identified correctly.

Her front part is peepee and back is bottom.

Asked if mother talked about people not touching. Yes. Has anybody touched you that you didn't like? No. People wipe you in bathroom? No, I wear pants. Has anyone hurt peepee? Mom. Where? at home.

Has anybody tickled peepee? No. Did daddy tickle your peepee? No, he put his finger inside my pee pee. Where? At Uncle McDonald's. Inside Uncle McD's? No. He was carrying me in his arms—outside Uncle McDonald's going in. Did it hurt? Yes.

Was finger under your pants? Yes. Did he put his finger inside your peepee? Yes—Inside.

Tell us one more time. What did daddy do? He put his finger inside my pee pee. Where? At uncle McD'. In the bathroom? No, I told you he was carrying me—outside. Did you go the bathroom at U.M? Yes. Did daddy wipe you? Yes. Is this when he put his finger inside your pee pee? No. It was outside Uncle McD's—I told you.

In a separate summary of her investigation, Gumula elaborated on why she found Susan's statements to be credible.

[Susan] was asked various open-ended questions in an attempt to find out if she had been touched where she should not have been touched.... Sometimes very young children do not understand questions in the way they are intended. Their thinking can be very concrete and they do not have all of the definitions and connotations of words that adults have. It can be very hard to hit on the exact phrasing that children so young can understand. Sometimes very young children have to be asked a direct question when open-ended questions do not elicit information. This was the case with [Susan]. She denied that anyone ever hurt her pee pee except her mother, at home. She denied that anyone had ever tickled her pee pee. When asked directly if daddy had ever tickled her pee pee she replied "No, he put his finger inside my pee pee."

This statement was a complete surprise. Children do not know about vaginal penetration with fingers or other objects unless they have had some exposure to this occurrence.... [Susan] was definite that her father did this to her, and she said it happened when he was carrying her into MacDonalds [sic] the day they went to the Aquarium. She denied that it happened in the bathroom when this suggestion was made, and she maintained that he put his finger inside her vagina when asked several different ways. She became impatient with investigators' efforts to define the action in a different way and as taking place at a different time. She was consistent in her disclosure.

Gumula's handwritten notes from the investigation reflect that she had several conversations with both Ms. F. and Mr. F. Gumula noted that in her first conversation with Ms. F., the mother alleged that Mr. F. was an alcoholic, a drug addict, and a pornography addict, and that he was "not employable." The notes do not reflect that Gumula reported these allegations to Mr. F. during her conversations with him, and they do not reflect any specific responses to these charges by Mr. F.[2]

Ultimately, Gumula did record her credibility assessments of both Mr. F. and Ms. F. She concluded that Ms. F. was credible and that Mr. F. lied. She based her conclusions on statements made by both Ms. F. and Mr. F. But she ignored discrepancies in Ms. F.'s statements about matters she considered critical to her credibility determinations.

The most significant discrepancy related to whether, just before Penn and Gumula interviewed the child, Ms. F. informed them that Susan had said something about her father hurting her pee pee with his finger. Penn's report says that "[Ms. F.] stated that she now remembers her daughter saying something to her the evening of her trip to the aquarium about her father hurting her," either "from wiping her or with his finger." It also states that "Mrs. [F] stated that the

---

2. Mr. F. apparently denied these allegations when he learned about them, and contended that they revealed his ex-wife's desire to undermine his relationship with his daughter.

following Friday when her ex-husband came to visit, [Susan] told him either my pee-pee hurt, or you hurt my pee-pee." Gumula's handwritten notes from the same interview state that Ms. F. told them Susan had mentioned something about her father hurting her: "Can't remem[er] her exact words— [said] dadd[y] hurt her—can't remem[er]—nothing in it to her."

In contrast, Gumula's typed reports of her investigation do not mention these statements by Ms. F. To the contrary, Gumula reported that Ms. F. denied that Susan ever said anything about her father hurting her: "Mrs. [F.] said [Susan] never mentioned anything about anyone tickling her vagina and never said anything about her father hurting her with his finger. She said if [Susan] had said anything like that, she would have made a report herself."

Ultimately, Gumula ignored this discrepancy in reaching her conclusion that Ms. F.'s denial was credible.[3] Although Penn's report and Gumula's handwritten notes both reflected that Ms. F. said she heard Susan say something about Mr. F. hurting her pee pee, and acknowledged that both investigators knew about this allegation before they interviewed Susan, Gumula did not mention this evidence in her reports. Instead, the social worker reported only Ms. F.'s denial that Susan had ever said anything about her father hurting her. Gumula then concluded that Ms. F.'s denial was credible, and that Mr. F. lied when he alleged that his ex-wife responded to his concerns about why Susan was talking about "tickling her pee

---

3. Another difference between the police and MCHHS reports involved whether Mr. F. ever "confessed" to his ex-wife that he had hurt Susan. Gumula's handwritten notes from the August 5th interview with Ms. F. stated that Ms. F. reported that Mr. F. "[c]alled her today & [said] confessed to he touched her on pee pee. . . ." Gumula's typewritten summary also states that "Mrs. [F.] told investigators that when Mr. [F.] called her [about the impending report to social services] she understood him to say that he had touched [Susan] on her pee pee and hurt her." But Penn's report of the August 5th interview does not mention that Ms. F. said anything about an alleged admission by Mr. F. Gumula ultimately concluded that "perhaps [Mr. F.] did slip and admit it to Mrs. [F.] without meaning to, but perhaps Mrs. [F.] misunderstood."

pee" with an allegation that Susan had told her that he hurt her pee pee with his finger.

> [Mr. F.] said . . . Mrs. [F.] had told him [Susan] said that he hurt her pee pee with his finger. (This is something Mrs. [F.] adamantly denied.) He said Mrs. [F.'s] statement worried him and he called her again to talk more about it with her. (*This is a further elaboration on what appears to be a lie.* Mrs. [F.'s] distrust of him because of his past behavior was evident, and her statement that she would have made a report if [Susan] had ever said anything like this to her was credible.) [Emphasis added.]

Gumula's two reports reflect that she based her finding that the abuse was "indicated" on her credibility assessments of the child, the mother, and the father. Despite Ms. F.'s inconsistent statements, Gumula chose to believe her rather than Mr. F.

> [Mr. F.] lied when he said Mrs. [F.] told him [Susan] said he had hurt her pee pee with his finger, and that they had discussed the issue before this report was made. Mr. [F.] began to blame Mrs. [F.] for making allegations and for setting him up, even though this was clearly not so.

> It is this worker's opinion that Mr. [F.] did insert his finger into [Susan's] vagina. It is this worker's opinion that Mr. [F.] was bothered by this, either because he did it or because he thought he was going to get caught, and he brought it up to [his therapist] to establish that perhaps someone else was abusing [Susan], saying she asked him if he were going to tickle her pee pee.

In her final "Summary for Risk Assessment,"[4] Gumula confirmed that her finding of indicated abuse was based on her credibility conclusions.

---

4. Gumula also concluded that Mr. F. presented a high or significant risk of future harm to Susan based on her evaluation of his perception of the child; his behaviors, feelings, and level of adaptation; his child rearing practices; and his own personal history of "problem-filled life experience." She gave Ms. F. the highest evaluation for each of these same factors.

Mrs. [F.] said [Susan] never told her that her father hurt her pee pee with his finger because she would have reported that herself. So this statement was . . . not true. She has not trusted Mr. [F.] for a long time. Mr. [F.] is the only one saying anything about hurting [Susan's] pee pee with his finger, that is until [Susan] told investigators that he stuck his finger *into* her pee pee and *it hurt.*

It is the opinion of this investigator that Mr. [F.] did indeed stick his finger into [Susan's]'s vagina as she told investigators in no uncertain terms several times. It is the opinion of this investigator that Mr. [F.] was anxious about what he had done and was afraid of being caught so he brought up the issue of sexual abuse of [Susan] in a way that suggested that perhaps someone else had done something to her but that he had not. He even told this investigator that Mrs. [F.] had told him [Susan] told her that he had hurt her pee pee with his finger (which is what happened) when Mrs. [F.] had never heard that from [Susan]. ***Mrs. [F.] never heard that until investigators told her after the interview with [Susan] what she had said.*** In trying to cover up what he had done and in trying to establish the possibility of someone else's having abused [Susan], Mr. [F.] gave himself away. [Emphasis added.]

On August 20, 1998, MCHHS advised Ms. F. in writing that "[t]he information obtained during the investigation supports the conclusion that [Susan] was sexually abused by her father. The finding will go on file as 'indicated'." Because MCHHS believed that Ms. F. was "in a position to protect [Susan] from further abuse," and had taken legal steps to do so, the agency closed its case. On September 3, 1998, MCHHS notified Mr. F. that it intended to include his name in its central registry listing cases of indicated or unsubstantiated charges of child abuse or neglect. Denying the charge, Mr. F. requested a contested hearing.

### Administrative Proceedings

Mr. F. represented himself at the contested case hearing before an administrative law judge ("ALJ"). The only two

witnesses were Mr. F. and MCHHS's social worker, Ms. Gumula. Neither Susan, the therapist, Ms. F., nor Det. Penn testified. Penn's report and all notes, reports, summaries, and correspondence in MCHHS's case file were admitted into evidence.

The ALJ accepted Gumula as an expert witness in the area of child abuse and neglect investigation. Gumula testified that when she and Penn interviewed Ms. F., "she told us that when ... her ex-husband called her [to advise her that about the investigation], she understood him to say that he had touched [Susan] on her pee-pee and hurt her." Gumula also testified that Ms. F. "said that [Susan] never said anything to her about anybody tickling her vagina and .... about her father hurting her vagina ... with his finger." According to Gumula, Ms. F. "flat out denied that" Susan had said any such thing, or that she had discussed the matter with Mr. F.

MCHHS's counsel then asked Gumula for her opinion, "[b]ased upon your experience and your expertise in the area of child sex abuse investigation," and on her investigation of the case. Gumula testified that "[m]y opinion was that [Susan] was credible when she said that her father stuck his finger in her pee-pee." She testified that she based her opinion on the fact that "[t]his was a very unusual statement for a three year old child to offer," and that [Susan] was mature enough to resist efforts to have her say that the event happened in the bathroom. MCHHS's counsel then asked Gumula to reiterate and summarize her conclusions.

[MCHHS counsel]: [J]ust to reiterate, you found the evidence credible?

A: Yes....

Q: [W]hat factors did you consider in making the finding of indicated child sexual abuse by Mr. [F.]?

A: Well, number one that [Susan] is a child and that Mr. [F.] is her father. That sticking up there is no reason, unless you're a doctor doing an internal examination to stick your finger in a child's vagina. Other people do that for—

for sexual gratification. And I think Mr. [F.'s] own behavior was a strong impetus to make that finding.

Q: Was it an impetus in your investigation as well as the finding?

A: ... [O]nce [Susan] told us that he stuck his finger in her vagina and once Mr. [F.] started to give us—to turn a completely different slant on the whole investigation then we had originally gotten it, then we really began to suspect that Mr. [F.] had done that.

*The facts that Mr. [F.] had talked about as being factual were not. I mean they were contrary to what we had been told* and to what we had said we had been told and Mr. [F.] insisted that this was his ex-wife setting him up, that he was set up to be blamed for this and no matter what we said we couldn't tell him differently and he's focused on that. (Emphasis added.)

On cross-examination by Mr. F., Gumula admitted that the investigators did not visit the McDonald's where the incident was alleged to have occurred. She also confirmed that the physical examination of Susan revealed "no physical findings of anything."

Mr. F. also questioned Gumula about why she found Ms. F. to be credible without inquiring into her personal history (which Mr. F. suggested included two prior, physically abusive ex-husbands, long term mental illness requiring hospitalization and treatment for depression, and a suicide attempt). He also asked why she recorded Ms. F.'s accusations that Mr. F. was an alcoholic, drug addict, pornography addict, and unemployable, but did not advise Mr. F. about these accusations when she interviewed him. Gumula denied that Ms. F.'s statements or accusations about Mr. F. had any bearing on her investigation or on her conclusion that the abuse occurred.

Mr. F. then addressed Gumula's reliance on Ms. F.'s denial that she had ever raised the possibility that Mr. F. hurt Susan at any time before the August 5th interview with Penn and Gumula.

[Mr. F.]:.... I want to go back to your statement that Mrs. [F.] said that if she had heard anything from [Susan] that I had hurt her pee-pee, that she would have made a report?

A: That's what she said, yes.

Q: And you find that a credible statement?

A: Yes, I do.

Q: Were you and Detective Penn in the same room at the same time interviewing Mrs. [F.]?

A: Yes.

Q: Can you explain the statement in Detective Penn's notes which says that Mrs. [F.] stated that she now remembers her daughter saying something to her the evening of the trip to the aquarium about her father hurting her?

A: That may be but not hurting her pee-pee.

Q: She said that she cannot recall if her daughter hurt her from wiping her or with his finger. That would refer to the vaginal area, would it not?

A: It could but she was very vague about what she heard and as I say that had no bearing....

Mr. F. questioned Gumula's claim that she did not rely on Ms. F.'s allegations in reaching her decision that the abuse occurred.

Q: She told you I confessed.... And that had no bearing?

A: No....

Q:.... *Is it then your statement that virtually none of what Mrs. [F.] said regarding my character entered into your decision making?*

A: *Not as to whether you put your finger into [Susan's] vagina because [Susan] said it.* [Emphasis added.]

Mr. F. concluded his cross-examination by questioning why Gumula had not addressed the physical and situational implausibility of the alleged incident.

[Mr. F.]:.... Does it make sense to you for a man with this sort of background [i.e., alleged Secret Service security clearances] to insert his finger into the vagina of a fully

clothed 35 pound child at high noon outside on a military base?

A: If digital penetration of a child made sense or there was any sense to be made of it, I don't know that anybody could do it.... [A] parent carrying a child with the child being like this in their arms ... has every opportunity to do something unseen to the child.... [T]here's every opportunity in carrying a child like this to move your hand in that area without being seen.

On direct, Mr. F. testified in his own defense that he did not abuse his daughter, did not lie, and had not changed his story.

My story to anyone who has bothered to check out the consistencies in it, has not changed a syllable since I first told it to my therapist.

On the occasion of my discussion of the incident with [Ms. F.],.... I asked [Ms. F.] how the phrase will you tickle my pee-pee got into [Susan's] vocabulary.... My concern about this phrase when I spoke to Mrs. [F.] was answered with the direct response. Yes, and she told me you hurt her pee-pee with your finger.

I was floored because I had not done this.... Mrs. [F.] then said, I know you didn't do it and I know you love her to distraction and that's a direct quote. But she failed to return several of my phone calls the following weekend after she had made this statement to me....

[O]n the following Sunday, I told my pastor, [my ex-wife] is setting me up for child sex abuse. On the following day, Monday, I went to my counselor and I said that exact same phrase. She said why.

I told her story and I said she said that [Susan] had told her that I hurt her pee-pee with my finger and that she didn't believe me but she wouldn't return my phone call. I asked her what I ... [was] supposed to do with this....

She said that she was legally obligated to tell the authorities. I begged her not to knowing [Ms. F.'s] pathology. At this point she did give me 24 hours in order to tell [Ms. F.]

to expect that phone call. Several times that Monday I called [Ms. F.]. My calls were not returned.

When I finally got a hold of her on the Tuesday her response had nothing to do with [Susan's] well being. It had everything to do with being angry at me for having exposed her to the judgment of total strangers as to how the phrase tickle my pee-pee got into my daughter's vocabulary.

She became very angry and said, you just lost the privilege of seeing your daughter. Slammed the phone down and those are the last words I ever heard from her. . . .

I wish to state that I do not know how [Susan] would interpret whatever happened outside of that McDonalds as what I am accused of. . . . I picked her up to cross the street. I took her in and we played. I believe very strongly that [Ms. F.'s] control issues which express themselves through continued interference with my relationship with my daughter are sufficiently intense as to give her the ability to plant the idea in the child's mind that whatever discomfort that was, was a result of my having touched her inappropriately.

I did not touch her inappropriately. . . . I have maintained and will forever maintain that I believe very strongly that the result of this investigation is a product of Mrs. [F.'s] manipulations.

In closing, MCHHS argued briefly that its "indicated" finding was appropriate because "[t]here is credible account by a child . . . that she was violated by her father that sexual abuse did occur that he poked his finger up her vaginal area." Mr. F. argued that Gumula's investigation was incomplete and compromised by her inappropriate reliance on Mrs. F.'s inconsistent statements, that Gumula had undermined her credibility by denying that Mrs. F. had influenced her conclusions, and that the case boiled down to whether Susan's reported statement was a sufficient basis for a finding that the abuse occurred.

The ALJ issued a written memorandum and order on November 5, 1999. She concluded that MCHHS's finding of

indicated child sexual abuse was not supported by any credible evidence. Disregarding Gumula's opinion that the abuse occurred, the ALJ found that "[t]he sole basis for [MCHHS's finding of indicated abuse] was an account given by the Child, which [MCHHS] found to be credible" because "it was 'clear and consistently maintained.'" She disagreed with MCHHS's assessment of the child's account, finding that the following factors "render it unreliable":

- *"Contradictory Statements"*—The ALJ noted that the child gave contradictory statements when she was asked if "people" wiped her in the bathroom ("No, I wear pants") and later, when she was asked if her father wiped her in the bathroom at McDonald's. ("Yes.") Because "[t]he interviewers did not ask any further questions to resolve these contradictory statements, .... the only explanation for the contradiction is that one of the Child's two statements on this point was not true." The ALJ concluded that because "[t]he Child did not tell the truth during the interview[,][h]er account of [Mr. F.'s] actions is thus rendered unreliable."

- *"Implausibility Of The Child's Account"*—The ALJ cited three reasons that the child's statement that Mr. F. put his finger inside her vagina while he was carrying her into McDonald's was "implausible":

 First, the location lacks privacy. [They] were likely to be surrounded by other people at the time the abuse was said to have occurred.

 Second, the Child was three years old. To carry a three year old while walking, an adult must usually use both arms to support the weight of the child. It is questionable whether any adult would have the physical ability to place his or her finger in a child's vagina while carrying her and walking.

 Third ... the Child's clothing would likely have blocked [Mr. F.'s] finger. If the Child had been wearing long pants or even shorts, these articles of clothing would have prevented [Mr. F.] from reaching his finger into the Child's vagina in the short period of time described.

The ALJ pointed out that Penn and Gumula also "had questions about the plausibility of the Child's account," as evidenced by their follow up questions regarding whether the incident occurred in the bathroom. She criticized them for failing to ask follow-up questions designed to assist in evaluating the plausibility of Susan's statement. [They] failed to ask the Child to explain how [Mr. F.] had carried her, or to demonstrate the location of [Mr. F.'s] hands. The interviewers also failed to ask the Child what she was wearing, whether it was a dress, or shorts, or long pants. Since these questions were not asked and answered, the Child's account must be evaluated on its own. The Child's account is essentially implausible.

- *"Inconsistency in Credibility Determination"*—The ALJ noted that MCHHS had ignored Susan's statement that her mother had hurt her, then explained it away at the hearing as an injury that occurred when her mother was washing her.

Since [MCHHS] did not address the possibility of sexual abuse of the Child by her mother, I must conclude that [MCHHS] did not consider the statement about the Child's mother to be credible. Yet there was no explanation of why this statement by the Child was not believed when the Child's statements about her father's actions were believed and accepted as fact.

Without any alternative explanation of the discrepancy in credibility findings, I can only conclude that [MCHHS] itself found the Child to be an unreliable informant.

For these three reasons, the ALJ found that

The Child's statements do not constitute credible evidence that sexual abuse did occur. Nor is there any other credible evidence in the record that sexual abuse occurred.

Since there is no credible evidence that an incident of sexual abuse occurred, [MCHHS's] finding of indicated sexual abuse cannot be upheld. Nor would a finding of unsubstantiated sexual abuse be appropriate. COMAR 07.02.07.12A(2). The proper finding is ruled-out sexual abuse. COMAR 07.02.07.12C(1).

## Circuit Court Proceedings

MCHHS attempted to reverse the ALJ's finding in circuit court. It argued that the ALJ erred by focusing on the child's credibility rather than by relying on Gumula's expert testimony. The circuit court rejected MCHHS's "expert opinion" argument as simply amounting to a demand that the social worker's opinion be treated as conclusive on both the credibility and the ultimate fact finding issues that are properly reserved for the fact finder. The court also questioned why MCHHS had not investigated any further.

> Well, what disturbs the Court about the account is ... I don't even know what the child was wearing.... Was the child wearing slacks, or was the child wearing shorts, or was this child wearing a dress, and why didn't your experts give us evidence of that?.... [H]ow could this insertion have been made while he is carrying the child assumedly fully clothed?.... Wouldn't that be the sort of circumstantial evidence that an expert should delve into, rather than simply take a child's statement, and go no further, and say because I am an expert, and that child wouldn't lie, that this man has abused his daughter?

The circuit court affirmed the ALJ's "ruled out" determination on the grounds that MCHHS had not met its burden of proof. Deferring to the ALJ's credibility determinations, the circuit court concluded that there was sufficient evidence—or lack thereof—to support the ALJ's reasons for finding that the child's statement was not reliable. MCHHS noted this timely appeal.

## DISCUSSION

### I.

### Standards Of Review For Child Sexual Abuse Cases

*Administrative Classification And Reporting Standards*

MCHHS must select one of three statutorily defined dispositions for all reports of child sexual abuse: "indicated," "ruled

out," or "unsubstantiated." An "indicated" case of child sexual abuse is premised on a "finding that there is credible evidence, which has not been satisfactorily refuted, that abuse, neglect, or sexual abuse did occur." Md.Code (1954, 1999 Repl.Vol., 2000 Cum.Supp.), § 5–701(k) of the Family Law Article ("FL"); COMAR 07.02.07.12A(2). Cases in which child sexual abuse is "indicated" may be included in a central registry of child abuse and neglect cases that is maintained by a local department of social services (a "local department"). *See* FL § 5–714. MCHHS's registry is part of a network of similar registries maintained by other county social services departments throughout Maryland. *See id.* In many cases, the identity of a person whom a local department has determined was responsible for child sexual abuse may be discerned from these networked central registries.[5]

---

**5.** The Court of Appeals has recognized that the identity of a suspected abuser may be discerned even if the report does not denote the suspected individual. In *Montgomery County Dept. Of Social Svcs. v. L.D.*, 349 Md. 239, 707 A.2d 1331 (1998), the Court pointed out that identifying the suspected abuser is especially possible when the record lists only the names and ages of the parents.

If . . . an anonymous report of abuse involved a single parent and one child, someone reviewing records related to this incident on the [central registry used by the local department] could infer easily from that record who is the parent listed on the registry. Additionally, the reviewer can discern that the child and parent are entered in the database because of a finding of indicated . . . abuse or neglect because no other persons are listed and from the disposition of the case therefore can infer that the parent is responsible for the abuse or neglect. Accordingly, we believe that the [local departments'] registries sufficiently identify individuals suspected by local departments of abuse or neglect within the meaning of section 5–715.

*Id.* at 266–67, 707 A.2d 1331. The Court noted that "the information stored on the databases is accessible statewide" by individuals involved in child abuse investigations, including staff of the state's Department of Health and Human Services, local Health and Human Services departments, and law enforcement officers. *Id.* at 265, 707 A.2d 1331. In fact, the Court noted, local departments throughout the state routinely check these databases as part of investigating every report of child abuse, in order to determine whether any services have been provided to the child, caretaker, household, or family member. *See id.* at 266–67, 707 A.2d 1331.

In this case, the inference that Mr. F. is the accused abuser would be rather easy to draw, because the only adult names on the record in

If there is a "finding that abuse, neglect, or sexual abuse did not occur," then the proper finding is "ruled out." FL § 5–701(t). Under current regulations promulgated by the Maryland Department of Health and Human Services, "this disposition shall be used when a preponderance of the evidence shows that abuse did not occur." COMAR 07.02.07.12C. A local HHS department must expunge its records of any allegations of abuse within 120 days of such a finding. COMAR 07.02.07.18B.

Finally, a report of child abuse is "unsubstantiated" when there is "a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out." FL § 5–701(v). MCHHS may include unsubstantiated abuse records in its child abuse and neglect registry for five years. *See* COMAR 07.02.07.18A.

### *Judicial Review Of Administrative Decision*

■ In a contested case proceeding to determine the validity of a local department's disposition of a particular child sexual abuse case, the administrative law judge has a fact finding role. *See C.S. v. Prince George's County Dept. of Soc. Svcs.*, 343 Md. 14, 33, 680 A.2d 470 (1996). She must "sift between potentially conflicting information provided by [the local department] and the alleged abuser to determine whether there are sufficient facts to meet the definitions of" indicated or unsubstantiated abuse. *Id.*

■ The ALJ's determination can be challenged in circuit court. *See* FL § 5–706.1. Appeals from the ALJ to the circuit court, and from the circuit court to the appellate courts, are governed by the same standards of review. *See Mayberry v. Anne Arundel County Bd. of Educ.*, 131 Md.App. 686, 700–01, 750 A.2d 677 (2000). "The test for determining whether the ... findings of fact are supported by substantial evidence is

___

Susan's case would be the two parents. Because the record would show that the child remains in the care and custody of her mother, persons reviewing the record could infer that MCHHS determined that Mr. F. abused his daughter.

whether reasoning minds could reach the same conclusion from the facts relied upon by the [agency].... When an agency's decision is based on an erroneous legal conclusion, however, we will substitute our own judgment for that of the agency." *Id.*

## II.

In this appeal, MCHHS presents what it characterizes as a single mixed question of law and fact. We perceive its contentions to constitute two related, but distinctly different arguments. First, MCHHS complains that the ALJ erred by improperly disregarding Gumula's expert opinion that the abuse occurred. Second, it argues that the reasons cited by the ALJ as grounds for her factual finding that the child's account was not sufficiently reliable to constitute credible evidence of abuse were not supported by the record. We disagree with both arguments, and address them separately.

## A.

### The ALJ Did Not Err By Disregarding The Social Worker's Vouching Opinion

MCHHS contends that "the ALJ's decision should be reversed because it failed to articulate an adequate basis for casting aside the expert testimony...." It argues that "the ALJ err[ed] in finding that [it] produced 'no credible evidence' that [Mr. F.] had sexually abused his three-year-old daughter, [because] an expert in child abuse investigations testified that in her opinion the child had been abused based on the consistent and adamant account that the child had given her...." MCHHS's argument is essentially that the ALJ had to consider its expert's opinion as "credible evidence" of child abuse even when it is clear that the opinion was predicated upon what the ALJ determined was an unreliable out of court statement by a three year old. According to MCHHS, as long as it presents its expert to testify that she believed the child's

statement, then the ALJ could not make a finding of "ruled out." [6]

■ We disagree, and question why MCHHS relies on a legal argument that has been rejected by Court of Appeals precedent governing expert testimony in sexual abuse cases. The notion that the ALJ was obligated to credit the expert opinion of MCHHS's social worker that the child was credible, rather than independently assessing the credibility of the child's reported statement, is clearly contrary to a basic evidentiary rule that MCHHS should know and honor, even in administrative proceedings. "[W]hile administrative agencies are not bound to observe the 'technical common law rules of evidence,' they are not prevented from doing so as long as the evidentiary rules are not applied in an arbitrary or oppressive manner that deprives a party of his right to a fair hearing."

---

6. In the circuit court, MCHHS contended that the proper disposition of this case was "unsubstantiated," rather than "ruled out," because (1) the child's statement and the MCHHS expert's opinion prevented Mr. F. from proving by a preponderance of the evidence that the abuse did not occur; and (2) the ALJ found that "there [was] no credible account by the suspected victim." *Compare* FL § 5–701(v) (" 'Ruled out' means a finding that ... sexual abuse did not occur"), *with* COMAR 07.02.07.12C (ruled out "disposition shall be used when a preponderance of the evidence shows that abuse did not occur," because *inter alia* "[t]here is no credible evidence of ... an incident involving sexual molestation or exploitation having occurred"); *compare also* FL § 5–701(v) (" 'Unsubstantiated' means a finding that there is an insufficient amount of evidence to support a finding of indicated or ruled out"), *with* COMAR 07.02.07.12B ("unsubstantiated" finding means "there is insufficient evidence to support a finding of indicated or ruled out," because "[t]here is no credible account by the suspected victim"). MCHHS has abandoned these contentions in this appeal. Accordingly, we leave for another day the questions of whether these regulations impose an impermissible burden on persons accused of child sexual abuse to prove their innocence, and whether they impermissibly authorize MCHHS to classify and centrally register suspected abusers in an "unsubstantiated" case on the grounds that "there is no credible account by the suspected victim." *See id; cf. C.S., supra,* 343 Md. at 30, 680 A.2d 470 (history of statutes governing investigation and determination of child abuse allegations "demonstrates the legislature's concern that before information relating to alleged child abuse can be disseminated state-wide, that information must have been demonstrated to be accurate either through adjudication or an administrative hearing").

*Comm'n on Medical Discipline v. Stillman,* 291 Md. 390, 422, 435 A.2d 747 (1981); *cf. Dept. of Public Safety v. Scruggs,* 79 Md.App. 312, 322–25, 556 A.2d 736 (1989) ("whether in judicial or administrative proceedings, the evidence presented must be considered *'competent'* "; admission of incompetent polygraph evidence in administrative proceeding was prejudicial error). In this case, we think the ALJ correctly recognized that the important reasons that the Court of Appeals has articulated for limiting expert "credibility opinions" in judicial proceedings were equally applicable in this administrative proceeding.

These reasons are set forth in the Court of Appeals' decisions in *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), and *Bentley v. Carroll,* 355 Md. 312, 734 A.2d 697 (1999). In both decisions, the Court made it clear that child sexual abuse cannot be proved by an expert's testimony that, in her opinion, the abuse occurred because the alleged child victim was credible.

In *Bohnert,* the Court reversed a child sexual abuse conviction because the social worker's expert testimony that the child had been sexually abused was predicated on the child's uncorroborated statements. The *Bohnert* Court articulated two reasons that such expert testimony constitutes reversible error.

First, the court held that when the expert's opinion that the alleged abuse occurred was based primarily on the child's statements, there is an inadequate factual foundation for that opinion.

> The record leads to no other conclusion than that [the social worker's] opinion was founded only upon what [the child] said had occurred. As far as can be gleaned from the record, the source of all the evidence concerning the incidents was the child—what she told [the social worker], what the mother said the child told her, what the mother's friend said the child told her. [The social worker] proffered no evidence as to objective tests or medically recognized syndromes with respect to the child.... There was no physical evidence on which to base the opinion. There were no

eyewitnesses. The opinion was reached on the child's unsubstantiated averments and "a certain sense about children" which [the social worker] believed she possessed. [The social worker's] intuitive reaction to the child's story did not suffice to provide a foundation for the opinion that the child was, in fact, sexually abused. The opinion of [the social worker] was not based on facts sufficient to form a basis for her opinion.

*Id.* at 276, 539 A.2d 657.

The second reason assigned by the *Bohnert* Court was that a social worker's opinion regarding the credibility of the child invades the fact finder's role in assessing credibility and resolving disputed facts. Citing well-established limitations on the role of witnesses, the *Bohnert* Court held that the social worker's opinion constituted an improper "vouching" for the credibility of the alleged victim.

In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury.... It is also error [in civil cases] for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying....

Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination....

We have never indicated that a person can qualify as an "expert in credibility," no matter what his experience or expertise.... [T]he credibility to be given a witness and the weight to be given his testimony [is] confined to the resolution of [the fact finder]. *It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth.* Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law.

Furthermore, we observe that it is not the function of an expert to resolve conflicting evidence. The rationale for excluding conclusions based on the resolution of contested facts is that the conclusion requires a judgment which invades the province of the . . . finder of facts.

**The opinion of [the social worker] that [the child] in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that [the accused] was lying. In the circumstances here, the opinion could only be reached if the child's testimony were believed and [the accused's] testimony disbelieved. The import of the opinion was clear—[the child] was credible and [the accused] was not. Also, the opinion could only be reached by the resolution of contested facts—[the child's] allegations and [the accused's] denials. Thus, the opinion was inadmissible as matter of law because it invaded the province of the jury in two ways. It encroached on the [fact finder's] function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts.**

*Id.* at 277–79, 539 A.2d 657 (emphasis added) (citations omitted).

The Court of Appeals recently affirmed these principles. In *Bentley, supra,* the Court reversed a jury verdict in a medical malpractice case due to improper expert testimony by the defendants' forensic psychiatrist. *See Bentley,* 355 Md. at 332–34, 734 A.2d 697. Quoting and applying *Bohnert,* the *Bentley* Court concluded that the witness improperly testified that the tests he administered to the plaintiff were a "mini-truth, or lie detector," and that the plaintiff's exaggeration of her complaints of emotional difficulties fit "a pattern in the validity scales that is seen predominantly in litigation involved patients." *Id.* at 333, 734 A.2d 697. The Court held that this testimony "was inadmissible, highly inflammable and prejudicial," emphasizing that "[o]ur resistance against admitting evidence of lie detection applies equally where human beings are the fount of such testimony[.]" *Id.* at 335, 734 A.2d 697.

Vouching by MCHHS's social worker is precisely what happened in this case. As Ms. Gumula's notes, report, and testimony make clear, her opinion that the abuse occurred was based on her decision to believe the damning aspects of the child's statement. As in *Bohnert,* "the opinion could only be reached if the child's testimony were believed and [the accused's] testimony disbelieved. The import of the opinion was clear—[the child] was credible and [the accused] was not." *Bohnert,* 312 Md. at 279, 539 A.2d 657.

 We are in complete agreement with the circuit court that the ALJ could properly disregard Gumula's opinion and make her own assessment of Susan's reported statement. MCHHS is correct that although the ALJ's decision reflects that she considered Gumula's testimony regarding the course of the investigation, there is no indication that she considered the social worker's expert opinion that the abuse occurred. If, as MCHHS complains, "the ALJ just swept aside Ms. Gumula's expert opinion that [Susan] was truthful in stating that her father 'put his finger inside her pee-pee,' " she was following well-reasoned authority in doing so. *See Comm'n on Medical Discipline,* 291 Md. at 422, 435 A.2d 747. Because Gumula's vouching opinion lacked an independent factual foundation and invaded the ALJ's fact finding role, the ALJ was legally correct in disregarding it.[7]

7. We also note that MCHHS apparently fails to appreciate that the ALJ was entitled to disregard any "non-vouching" opinion offered by Gumula. It is elementary that the ALJ did not have to agree with Gumula's expert opinion that the abuse occurred, nor did she have to find Gumula or her investigation credible. Indeed, the record shows that Mr. F. directly attacked Gumula's competence and credibility as a central part of his defense. The ALJ and circuit court indicated that they also questioned Gumula's investigation, noting her failure to pursue "fairly objective" matters that would have been helpful in evaluating the child's statement, such as what the child was wearing or how she was carried. *See* FL § 5–706 ("the local department . . . shall make a thorough investigation of a report of suspected abuse"); *C.S., supra,* 343 Md. at 30, 680 A.2d 470 (noting legislature's "deep concern" that authority of social services departments "must be tempered to ensure that individuals are not labeled as child abusers on the basis of inaccurate or incomplete information").

We now proceed to review the ALJ's findings that because the child's statement was unreliable, it did not constitute credible evidence that the abuse occurred.

## B.

### The ALJ's Assessment Of The Child's Out Of Court Statement Was Supported By The Evidence

MCHHS's alternative argument is the familiar "insufficiency of evidence" argument. It asserts that the record does not support the ALJ's conclusions that Susan's statement was contradictory and implausible, and that, based on MCHHS's own inconsistent treatment of some portions of the child's statement as credible and others as not credible, MCHHS itself found the child's statement to be unreliable. We disagree, and explain our reasons.

### 1.

### The ALJ Applied Proper Standards To Make A Threshold Determination Of Whether The Child's Statement Was Reliable

 Preliminarily, we shall affirm the method used by the ALJ for determining the appropriate evidentiary value of the child's statement. Susan's out of court statement is classic "hearsay" that inherently raises concerns about trustworthiness and reliability.[8] Although hearsay evidence may be admissible in an administrative proceeding, *see* Md.Code (1984, 1999 Repl.Vol.), § 10–213(c) of the State Government Article ("SG"), we think it was appropriate for the ALJ to question whether the hearsay statement by this three year old

---

8. *See generally* J. Murphy, *Maryland Evidence Handbook,* § 700, at 254 (3d ed. 1999) ("The factfinder cannot adequately evaluate either the credibility of the person who made the hearsay statement or the reliability of the information contained in it"); L. McLain, *Maryland Evidence,* § 8.01.1, at 271 (1987) ("The opponent's inability to cross-examine the declarant with regard to the four 'hearsay dangers,' perception, memory, sincerity, and narration, generally requires exclusion of the statement").

was sufficiently reliable to be considered credible evidence of child sexual abuse. We hold that the ALJ properly addressed whether the hearsay statement met the critical trustworthiness threshold, and that she did so in a manner consistent with the Legislature's approved method for evaluating the evidentiary value of a young child's out of court statement.

This legislatively approved method is set forth in Md.Code (1957, 1996 Repl.Vol., 2000 Cum.Supp.), Art. 27, § 775 ("§ 775"), which governs the admissibility of hearsay statements by a child abuse victim under 12 in juvenile and criminal court proceedings. This statute addresses the inherent questions of trustworthiness raised by such a young child's out of court statement and balances the need to protect child victims from the trauma of court proceedings with the fundamental right of the accused to test the reliability of evidence proffered against him or her. The Legislature has provided that a trial judge must make a preliminary determination of whether the young child's statement is sufficiently reliable to be admitted into evidence. The statute directs that such hearsay "may be admissible . . . only if the statement possesses particularized guarantees of trustworthiness." § 775(b)(3). It also enumerates several factors by which the trustworthiness of the child's statement must be measured.

In order to determine if a child's statement possesses particularized guarantees of trustworthiness under this section, the court shall consider, but is not limited to, the following factors:

(1) The child's personal knowledge of the event;

(2) The certainty that the statement was made;

(3) Any apparent motive to fabricate or exhibit partiality by the child, including interest, bias, corruption, or coercion;

(4) Whether the statement was spontaneous or directly responsive to questions;

(5) The timing of the statement;

(6) Whether the child's young age makes it unlikely that the child fabricated the statement that represents a graphic, detailed account beyond the child's knowledge and experi-

ence and the appropriateness of the terminology to the child's age;

(7) The nature and duration of the abuse;

(8) The inner consistency and coherence of the statement;

(9) Whether the child was suffering pain or distress when making the statement;

(10) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(11) Whether the statement is suggestive due to the use of leading questions; and

(12) The credibility of the person testifying about the statement.

*Id.* at § 775(d). If the child is available, the court must also "conduct an in camera examination of a child prior to determining the admissibility of the statement. . . ." *Id.* at § 775(f)(1). Moreover, "[i]f the child does not testify, the child's out of court statement will be admissible only if there is corroborative evidence that . . . . [t]he alleged offender . . . had the opportunity to commit the alleged abuse. . . ." *Id.* at § 775(c)(2).

In this case, the evidentiary and procedural limitations in section 775 were not mandatory because the proceedings did not involve a proceeding in court. Susan's out of court statement was admitted into evidence in an administrative hearing, pursuant to SG section 10–213(c). But the admission of this child's statement into the administrative record does not mean that the ALJ was required to give it the same weight that MCHHS attached to it. Here, the ALJ appropriately made an independent evaluation of this hearsay statement in light of the factors set forth in section 775. Applying relevant factors by analogy, she identified a number of reasons that the statement was not sufficiently reliable to constitute credible evidence that the reported incident actually occurred. We find that the ALJ was legally correct to make a threshold determination of trustworthiness by considering the factors identified in section 775.

## 2.

## The Evidence Supported The ALJ's Finding That
## The Child's Statement Was Not Reliable

 We now reach the last issue raised by MCHHS—whether there was sufficient evidence to support the ALJ's three reasons for her finding that the child's out of court statement was not reliable. Our review of the record reveals that the evidence supported the ALJ's factual conclusions that the child's statement was inconsistent and implausible, and that MCHHS itself treated portions of the statement as not credible. We review each of these reasons, and the supporting evidence, and hold that any one of them was sufficient grounds for the ALJ's finding.

First, the ALJ found that the child's statement was not reliable because she gave inconsistent answers regarding whether any person had wiped her in the bathroom. The ALJ concluded that because MCHHS made no attempt to have the child reconcile her two apparently contradictory answers, the answers remained contradictory, and therefore one or the other was untrue. MCHHS complains that the child's responses were not necessarily inconsistent or contradictory if they are viewed through the prism that MCHHS suggests they should be interpreted. It contends that the child's answers differed because the first question (Do "people" wipe you in the bathroom? "No, I wear pants") was not as "concrete" as the latter question (Did daddy wipe you in the bathroom? "Yes"). In support of this interpretation, Gumula offered her expert opinion that children as young as Susan frequently do not respond reliably to questions that are not sufficiently narrow and direct. She opined that the "anybody" question was too generalized for Susan to understand, but that the "daddy" question was sufficiently specific for Susan to give an accurate response.

The answer to this argument is that the ALJ was not obligated to credit Gumula's explanation, or to adopt MCHHS's model for reconciling the child's answers. Her rejection of Gumula's opinion was bolstered by her observation

that Gumula selectively applied such "reconciliation reasoning" to justify continuing her investigation against Mr. F., while failing to explain why the child's specific statement against her mother did not merit any investigation of the mother. As the fact finder, the ALJ was charged with drawing her own inferences and conclusions from the child's reported statement. We believe the cited evidence was sufficient to support the ALJ's conclusion that young Susan's statement was internally inconsistent. *Cf.* § 775(d)(8) (evaluation should consider "particularized guarantees of trustworthiness," including "inner consistency and coherence of the statement"). Given the importance that MCHHS itself attributed to consistent responses, we find that this inconsistency was sufficiently material to undermine the reliability of the child's subsequent statement that her father put his finger inside her.[9]

The second reason that the ALJ found Susan's statement was unreliable was that the child's account of the incident was implausible. MCHHS's contention that the child's account was no more implausible than the fact that child sexual abuse exists oversimplifies and misses the point made by the ALJ— that MCHHS made no effort to pursue or present any corroborating details that might have explained how this act could have been accomplished in the time, place, and manner described in the child's statement. The ALJ noted that MCHHS did not seek additional information regarding what the child was wearing, how she was being carried when the alleged digital penetration occurred, or the particular setting where the incident allegedly occurred. Such additional evidence might have added important detail that was corroborating or exculpatory. Instead, MCHHS based its entire investi-

---

9. Moreover, the ALJ was free to conclude that moving from general to specific questions might have been either confusing and/or suggestive. *See, e.g.,* § 775(d)(11) (trustworthiness of child's statement may depend on "whether the statement is suggestive due to the use of leading questions"). We note that the particular response upon which this entire case was based was elicited after a similar "general to specific" inquiry. ("[Susan] was asked if anyone had tickled her pee-pee, she answered 'no'. And when asked if her Daddy tickled her pee-pee, the girl said, 'No, he put his finger inside my pee-pee.' ")

gation and findings on this three year old's brief statement, without sufficiently investigating "[w]hether extrinsic evidence exist[ed] to show the defendant's opportunity to commit the act complained of in the child's statement." *See* § 775(d)(10); FL § 5–706 (local department must "make a thorough investigation"). Given the plausibility questions raised by the child's account, the ALJ was justified in making a factual finding based on the lack of any "corroborative evidence that . . . the alleged offender . . . had the opportunity to commit the alleged abuse . . . ." *See* § 775(c)(2).

The final reason that the ALJ found the child's statement unreliable was that MCHHS itself had not found the statement sufficiently credible or reliable to justify an investigation of the child's statement that her mother hurt her. In its brief, MCHHS states that "[t]he ALJ noted . . . that Ms. Gumula did not follow up on [Susan's] statements about her mother hurting her because [Susan] told her that this happened when her mother washed her."

Our review of the ALJ's decision and Gumula's testimony reveals that MCHHS has mischaracterized both. The ALJ stated that "included in Ms. Gumula's testimony was an added statement, that the Child's mother hurt her vagina while washing her." Gumula testified that "when we asked her did anybody ever hurt her pee-pee, she said yes, her mother did at home, but she really couldn't tell, you know when she was washing her. . . ." Neither of these statements says that the source of Gumula's "washing" explanation was the child herself. Moreover, as the ALJ correctly observed, none of the notes or reports that Gumula made contemporaneously with the interview and investigation mentioned this "washing" explanation. In these circumstances, the evidence supported the ALJ's conclusion that Gumula and MCHHS "did not consider the statement about the Child's mother to be credible," but did not explain "why this statement by the Child was not believed when the Child's statements about her father's actions were believed and accepted as fact." In turn, this conclusion supported the ALJ's finding that even MCHHS found the child's statement to be inconsistent and unreliable.

We find no error by either the ALJ or the circuit court. MCHHS must comply with the order to reclassify the case as "ruled out," and expunge its records and registry.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**