6 A.3d 329

S.B.

v.

**ANNE ARUNDEL COUNTY DEPARTMENT
OF SOCIAL SERVICES.**

**No. 25, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Oct. 1, 2010.

Scott M. Baldwin, of Arnold, MD, for appellant.

Sandra Barnes (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: WRIGHT, GRAEFF, and PAUL E. ALPERT, (Retired, Specially Assigned), JJ.

PAUL E. ALPERT, J. (Retired, Specially Assigned).

After the Anne Arundel County Department of Social Services ("DSS"), appellee and cross-appellant, found "indicated" child sexual abuse by S.B., appellant and cross-appellee,[1] against his girlfriend's five and seven year old sons, an admin-

---

1. As a measure of privacy, we have used initials and first names to identify appellant and cross-appellee, as well as the children and their family members.

istrative law judge (ALJ) changed that finding to "unsubstantiated." The Circuit Court for Anne Arundel County denied DSS's motion to dismiss Mr. B.'s petition for judicial review on timeliness grounds and affirmed the ALJ's decision.

Mr. B. appeals, arguing that the evidentiary record requires that the allegations of abuse must be designated as "ruled out" and that the ALJ erred in relying on the children's hearsay statements.[2] DSS counters that there is substantial evidence to support the ALJ's decision that the allegations of child sexual abuse are "unsubstantiated" rather than "ruled out" and that the ALJ properly evaluated, admitted, and relied upon the children's hearsay statements. In a cross-appeal, DSS alternatively argues that the circuit court erred in failing to dismiss Mr. B.'s petition for judicial review, because it was filed two days after the thirty day deadline. Although Mr. B.'s challenges to the ALJ's decision lack merit, ultimately we conclude that his petition for judicial review should have been dismissed as untimely.

## FACTS AND LEGAL PROCEEDINGS

These proceedings involve a divided family engaged in a custody tug-of-war over three young boys. In October 2006, Mr. B. was living with J.M. ("Mother") and her sons Kyle

---

**2.** We have restated and consolidated Mr. B.'s questions, which he presented as follows:

I. Whether the tender years statutory procedure denied the appellant of the Confrontation Clause. *U.S.C.A. Const. Amend. 6; West's Ann. Md.Code, Criminal Procedure 11–304.*

II. Whether the [local department] failed in [its] burden to prove [its] case through production of witnesses and evidence that conform to the state and federal constitutions.

III. Whether the Office of Administrative Hearings [OAH] correctly assessed the factors used for guidance from *Montgomery County Department of Health & Human Services v. P.F.*, 137 Md.App. 243, 273, 768 A.2d 112, 129 (2001) ("*P.F.*")

IV. Whether the lower Court erred in affirming the Administrative Decision to find the Appellant of "Unsubstantiated" child sexual abuse.

V. Whether the lower Court erred in determining that the [OAH] decision was not "arbitrary" *Natural Resources v. U.S.*, 966 F.2d 1292, 1297 (9th Cir.1992)

(born August 28, 2001), Tyler (born June 23, 1999), and Michael (born November 15, 1997) (the "Children"). Although Mr. B. is not the boys' biological father, they called him "Daddy." The Children had previously lived with their Mother in the home of her mother, B.L. ("Grandmother"), both when B.L. was living with her current husband D.L. ("Step–Grandfather") and, before they divorced in 2000, when she lived with her former husband, G.M. ("Grandfather").[3] The family schism is between Mr. B. and Mother, on the one hand, and Grandmother, Grandfather, and Step–Grandfather on the other hand.

After reviewing the administrative record, the circuit court gave the following account of the abuse allegations, DSS investigation, and administrative proceedings:

At the conclusion of an August 26, 2006 outing with the Children, Grandfather and Grandmother refused to take the Children to Mother. They did so because, during the outing, the children made statements leading them to believe that Mr. [B.] had sexually abused them. At the time, Kyle was 4, Tyler was 7, and Michael was 8.

When Grandparents refused to return the Children, Ms. [M.] called the police. Grandmother told the police about her concerns. The police, in turn, contacted the Anne Arundel County Department of Social Services ("DSS"), which then began an investigation.

On August 28, 2006, the DSS assigned Rashida Sims to investigate the allegations. Ms. Sims interviewed the Grandparents, Step–Grandfather and the Children. During those interviews, Grandparents and Step–Grandfather relayed statements made by the Children stating that Mr. [B.] had engaged in sexual activities with Kyle and Tyler. Kyle and Tyler substantiated what the Grandparents told Ms.

---

**3.** Grandmother and Grandfather divorced in 2000. Until then, Michael and Tyler lived with Mother at the grandparents' residence. After the divorce and Kyle's birth, the Children and Mother lived with Grandmother and Step–Grandfather, although Grandfather continued his active role in their lives.

Sims; Michael maintained he was never sexually abused and was unaware of what happened to Kyle and Tyler. . . .

On November 16, 2006, the DSS notified Mr. [B.] that it found him to be a person allegedly responsible for indicated child neglect. Mr. [B.] was also informed that he had a right to request a contested case hearing to challenge DSS's decision. On December 1, 2006, Mr. [B.] requested such a hearing.

On March 20 and 28, 2007, a contested case hearing was held at the DSS office in Annapolis, Maryland, before ALJ Ann C. Kahinde. At the start of the hearing, Mr. [B.] counsel moved to withdraw his appearance; Mr. [B.] agreed, and proceeded *pro se.*

On May 14, 2007, the ALJ issued a written decision based on the following findings of fact:

7. The maternal grandfather told Ms. Sims that after the [August 26, 2006] outing, he was driving Michael home and the maternal grandmother was driving Tyler and Kyle. The maternal grandmother called him on his cellphone and said that Tyler had told her that, "daddy plays with my bird and makes it big and Kyle, too." . . .

10. Ms. Sims also met with the maternal grandmother at the maternal grandfather's home on August 28 [2006]. [The maternal grandmother] said that in early August [2006], she told one of the boys to wrap a towel around his waist after changing out of a swimsuit and he stated, "let me show you what daddy does."

11. The maternal grandmother told Ms. Sims that on August 26, 2006, she asked the boys about daddy touching them, and Tyler made a statement that "daddy licked his butt."

12. On August 30, 2006, Ms. Sims and a detective interviewed all three children separately at the Child Advocacy Center. . . . All three boys refer to the penis as "bird."

13. Ms. Sims asked Kyle about touches he liked and does not like. Kyle said he did not know and shrugged his shoulders. Ms. Sims asked him if he was touched in a way

that he did not like and Kyle said "yes." Ms. Sims asked Kyle who did the touching and he said "Daddy." He was asked where on his body and Kyle pointed to the "butt" on the picture. Ms. Sims asked Kyle what he was touched with and he responded a "hand."

14. In response to Ms. Sims's questions, Kyle told her that the touching had happened on more than one occasion and that sometimes Michael was home and Tyler sees it happen. Kyle also told Ms. Sims that it happens in the home where daddy works "down in the basement, it is all painted down there." Kyle told Ms. Sims he did not know where on his body he was touched.

15. In the same interview, Kyle initially told Ms. Sims that he was not asked to touch his daddy. Later, he told Ms. Sims that his daddy asked him to touch his (his daddy's) bird and he touched his daddy's bird.

16. [Mr. B.] and his father own another house down the street from where he lives with the children's mother. [Mr. B.] and his father have gutted the property and are renovating it. . . . The walls of the basement were unpainted cinderblock.

17. Ms. Sims and the detective then interviewed Tyler. After talking about other types of touches, Ms. Sims asked Tyler if he had been touched on his butt or his bird or if he had been asked to touch anyone else. Tyler responded "no." Ms Sims said, "mom-mom [maternal grandmother] said something happened that you didn't like, is that true?" Tyler stated, "dad made his bird big and then that stuff and then he put it in me and Kyle's butts, we were crying." Ms. Sims asked Tyler how he knew that his daddy put his bird in his butt? Tyler said his dad tells him to turn over and he spits on his bird and "on our butts" and "then he rubs his bird on it."

18. Tyler also told Ms. Sims that [Mr. B.] went into a closet "to make his bird big." Tyler stated there is a television with a blue screen or video camera in the closet.

19. Ms. Sims inspected the inside of the home where [Mr. B.] and the mother of the children reside. Ms. Sims did not find a television or video camera in any of the closets....

21. On August 30, 2006, Ms. Sims and the detective interviewed the maternal grandfather, the maternal grandmother, and the step-grandfather.

22. The step-grandfather told Ms. Sims that the children were at their house in early August swimming in the pool. The step-grandfather was accidentally hit in the private area with the ball and Tyler said, "play with it and make white stuff come out." The step-grandfather asked Tyler where he got that from and Tyler said "daddy on his bed." The step-grandfather contradicted Tyler and Kyle and said, "yup he did."

23. The maternal grandmother told Ms. Sims that she and her husband tried to figure out where the statements came from and she asked Tyler and Kyle on August 26, 2006, if their daddy ever touched them. She said Kyle told her "yes" that his daddy put his bird in his mouth.

24. On August 31, 2006, Ms. Sims met with [Mr. B.] and the children's mother. The children's mother told Ms. Sims she has found the children playing with each other's bird in the bathtub. She alleged inappropriate sexual activities by her father (nude parties, nude swimming, allowing her children to view inappropriate movies and go to adult stores) and that the children were banned from the public library after they visited pornographic sites on the computer because the maternal grandfather was not properly supervising them....

25. On September 11, 2006, the boys were examined by a forensic pediatrician. There were no physical findings to establish trauma to the anus or penis of the three boys. Cultures were taken to test for sexually transmitted diseases; the cultures were negative....

30. On October 12, 2006, Ms. Sims interviewed Tyler at his school. Ms. Sims told Tyler that it was suggested he had been told what to say in his interview, exposed to sexually

inappropriate content, taken to sex stores and R-rated movies. Tyler denied that these things were true and said what he had said about his dad [was] true.

31. On October 12, 2006, Ms. Sims also interviewed Kyle at his school. Ms. Sims told Kyle that it was suggested he had been told what to say in his interview, exposed to sexually inappropriate content, taken to sex stores and R-rated movies. Kyle responded several times, "I don't know."

32. On October 12, 2006, Ms. Sims also interviewed Michael at his school. Michael was upset when he saw Ms. Sims. His mother had told him the day before that she would call Ms. Sims and have the three boys placed in a non-relative's home. Ms. Sims asked Michael about sexual interactions and he denied ever touching his brother's privates. Michael said it was true that he and his brothers were not listening or following his mother's directions. Michael denied being taken to R-rated movies or being asked to leave the library.

On the basis of these factual findings, the ALJ changed the finding of "indicated" child sexual abuse to "unsubstantiated." The ALJ reviewed the evidence in detail over eight pages of her written decision, making the following observations:

- Step–Grandfather did not testify and was interviewed only once, along with Grandmother. The record did not disclose whether the two were interviewed separately. His account of the boys' statements at the pool—"play with it and make white stuff come out" like "daddy on his bed"—suggested that the children may have witnessed masturbation, but did not suggest that they had been touched on their "butts and birds," as the DSS claimed at the hearing.

- The ALJ found it "puzzling" that, in light of their mutual desire "in wanting to raise the children outside the influence of" Mr. B., Grandmother "did not mention the incident at the swimming pool to" Grandfather when she learned about it from Step–Grandfather.

- Ms. Sims's notes of what Grandmother told her about the boys' statements in response to her questions on August 26

did not contain everything that Grandmother testified the children told her. The ALJ was uncertain whether Grandmother did not tell Ms. Sims about these statements or whether Ms. Sims did not record everything Grandmother told her.

- Although a police detective was present for Ms. Sims's first interviews with the boys, he provided no information, by way of notes or testimony. For that reason, the only information came from Ms. Sims, who "was not qualified as an expert in child abuse investigations." Although the ALJ elicited that she has a master's degree in counseling and that she used the protocol "Finding Words" to interview the children, DSS did not present Ms. Sims's qualifications other than working at DSS for one year.

- Ms. Sims asked appropriately "open-ended and non-leading" questions to Kyle, leading to his statement that "Daddy" touched him on his "butt" with a "hand."

- Kyle described the abuse as occurring at the house "where daddy 'works down in the basement, it is all painted down there.' " Ms. Sims confirmed that the house exists, but did not inspect that property. Mr. B.'s father testified credibly that "the basement has never been painted."

- When Tyler was interviewed by Ms. Sims, he answered, "no" when he was first asked whether he had been touched on his butt or his bird. Ms. Sims then "used a very leading question," stating, "mom-mom said something happened that you didn't like, is that true?" Tyler then gave a graphic description of Mr. B. becoming aroused, ejaculating, and anally penetrating both he and Kyle.

- Tyler's initial denial was not consistent with Mr. B.'s accusation that the child was coached. Nor was his inclusion of graphic details without further prompting.

- Although Tyler told Ms. Sims that Mr. B. went into a closet "to make his bird big," and that there was a television with a blue screen and a video camera in the closet, no such equipment was found in the home where they lived. But the ALJ noted that "anyone who had engaged in that activity

would immediately get rid of the evidence ... when they knew social services would be coming to the house to investigate." Mr. B. and his father both testified, however, that the closets were not "walk-ins" and would be difficult for an adult to enter.

- Michael denied abuse by Mr. B., knowledge of abuse of his brothers, and inappropriate activity by Grandfather. But the ALJ observed that it was possible that Michael was not abused because he was older and had "a greater capacity (due to age and education) to accurately describe the abuse. And all the children agreed that Kyle and Tyler went with Mr. B. to the renovation house more frequently than Michael.

- When Ms. Sims re-interviewed Tyler in October, he denied that he had been told what to say or exposed to sexually inappropriate content by his Grandfather. He insisted that "what he had said about his dad was true," which the ALJ found "especially important in light of the fact that when he was re-interviewed Tyler was now living back with his mother," even though Tyler presumably knew that she "supported [Mr. B.'s] innocence." (By that time, Mr. B. had moved out so the children would be returned to Mother.)

- Although Kyle answered, "I don't know" to nearly all questions Ms. Sims asked in the October re-interview, the ALJ did not find this proved or disproved that his original statement had been coached. Given his young age (five years old), that he had been moved back and forth between Grandfather and Mother, and that Mother told the children "that she would call Ms. Sims and have them removed somewhere else if their behavior did not improve," it was "not surprising" that "Kyle did not want to say anything."

Recognizing that the children's descriptions of genital arousal, contact, ejaculation, and anal penetration were critical evidence in the absence of any other witnesses or physical evidence of abuse, the ALJ carefully evaluated the trustworthiness of these hearsay statements over an additional eight pages of her decision. To determine whether the children's

accounts were sufficiently trustworthy to be treated as credible evidence of sexual abuse, the ALJ reviewed the statements in light of twelve statutory factors considered in determining the admissibility of hearsay statements by child abuse victims under the age of twelve in criminal and juvenile court proceedings under Maryland Code (2001, 2009 Cum.Supp.), section 11–304(e) of the Criminal Procedure Article ("CP")—a procedure we approved in *Montgomery County Dep't of Health & Human Servs. v. P.F.*, 137 Md.App. 243, 273, 768 A.2d 112 (2001) (hereafter cited as *"P.F."*)

The ALJ found the following factors to be indicative of trustworthiness:

- The children reported that they had personal knowledge of the events they described, and each separately "stated that the other one was aware of what their daddy did because the other one was present."

- "[T]here was no challenge from [Mr. B.] that these statements were not made by Tyler and Kyle to Ms. Sims."

- The ALJ was "not persuaded" that, even if Mother's allegations of inappropriate conduct by Grandfather were true, such behavior could "account[ ] for the details in the children's statements[.]" The graphic accounts of sexual abuse were "beyond the child's expected knowledge and experience," and the ALJ weighed this factor "decidedly against [Mr. B.'s] position that the statements were the result of coaching by the grandparents." The ALJ stated, "Assuming for the sake of argument that everything the children's mother said about her father was true, it still does not provide a credible foundation for wh[y] five and seven year old children would be able to graphically describe an adult male ejaculating and anal penetration."

- The boys used age-appropriate terminology. "The boys consistently used the terms 'butts' and 'birds' and Tyler did not have a word for ejaculate other than 'stuff' which appears appropriate for a boy of seven years."

- The ALJ had "no reason" to question the credibility of Ms. Sims.

On the other hand, the ALJ weighed the following factors against the trustworthiness of the children's statements:

- "[T]he grandparents, especially the grandfather, wanted custody of the children." Grandfather stated "that he didn't care what it took, he would get custody," and his "desire to obtain custody was a motive to encourage the children to make statements against [Mr. B.]."

- The spontaneous statement that Tyler made to his Step–Grandfather at the pool in early August—"play with it and make white stuff come out"—"did not involve a disclosure by the boys that they were touched by [Mr. B.] as counsel for the local department claimed."

- After the pool incident, none of the children's disclosures were spontaneous. To the contrary, "all of the children's statements were in response to being questioned by either their grandparents or by Ms. Sims."

- Ms. Sims and Grandmother used leading questions to elicit Tyler's disclosures.

- The ALJ "question[ed] why [Ms. Sims] was not more probing in her contacts with the maternal grandfather," especially because "some of the information she was obtaining from him might not have been as objective as she initially thought," given his strong interest in obtaining custody.

Finally, the ALJ explained that the following factors were either equivocal or not helpful in evaluating the trustworthiness of the children's statements:

- The "timing of the statements" did not aid the ALJ in evaluating their trustworthiness. Although Tyler and Kyle made statements to Grandmother in the car on August 26, this occurred after an outing with the grandparents, raising the possibility that they were coached. On the other hand, Mother and Mr. B. had been limiting the amount of time the children spent with Grandparents, making it difficult for Grandparents to coach them "to make very detailed statements with only one day of preparation." The timing of the statements both children later made in October was "not helpful because they had been returned to their mother

shortly before the re-interview" and Mother told them "they would be moved somewhere else if their behavior did not improve[.]"

- The "nature and duration of the [alleged] abuse" neither supported nor disproved trustworthiness, because the children "were vague as to how many times the abuse occurred," with Tyler stating that it "happened a long time ago" when it was both "hot and cold outside." Because Ms. Sims did not explain whether she tried to obtain more specific information, the ALJ did not consider this factor.

- The "internal consistency" of both children's statements was "mixed." For example, Kyle first said he was not asked to touch Mr. B.'s bird but later in the interview said Mr. B. did ask to be touched and Kyle did so, while in his October interview, he said, "I don't know." Similarly, when asked if he had been touched on his butt or bird, Tyler first answered "no," but after Ms. Sims told him his Grandmother "said something happened that you didn't like," he said, "dad made his bird big and then that stuff and then he put it in me and Kyle's butts, we were crying" and that "his dad tells him to turn over and he spits on his bird and 'on our butts' and 'then he rubs his bird on it.'" The ALJ noted that, although Tyler's statements were "coherent, . . . there was no way to judge their internal consistency because Ms. Sims did not testify that she asked the same question in different ways to see if she would elicit the same or different responses."

- The ALJ could not evaluate "whether Kyle and Tyler were suffering pain or distress when they made the statements because Ms. Sims did not describe their emotional state[.]"

- As for "opportunity to commit" the abuse described by the children, the ALJ noted that, although the children said the abuse occurred both at home and at the nearby house Mr. B. was renovating, the neighbor next door to the renovated house testified that the boys routinely played outside with her grandchildren, in her sight. The ALJ concluded that although Mr. B. may have had only "limited" opportunities,

the neighbor's testimony did not establish that he "was never alone in the house with Kyle and Tyler" or otherwise "account for where [the] children were during the cold months" they accompanied Mr. B. to the house.

Ultimately, the ALJ concluded that the children's descriptions of sexual abuse had been sufficiently challenged by Mr. B. that an "indicated" finding was not warranted. But she also concluded that these statements were still sufficiently credible that she could not find by a preponderance of the evidence that the abuse did not occur, as required to make a finding of "ruled out." Instead, the ALJ concluded that the appropriate finding was "unsubstantiated," explaining her decision as follows:

> The local department concluded that "indicated" child sexual abuse was found as to both Kyle and Tyler based primarily on their statements. The credibility of their statements was partially called into question by the fact that Tyler initially said he had not been touched by anyone (or asked to touch anyone) and it was only after the Investigator asked him a leading question that he disclosed what his daddy did. Additionally, the credibility of both of their statements [was] weakened by the fact that [Mr. B.] refuted Kyle's assertion that the basement was painted and Tyler's assertion that [Mr. B.] would walk into a closet that contained a television and video camera to masturbate. Finally, the credibility is somewhat weakened by the fact that the interviews took place in context of a custody battle between the maternal grandfather and the children's mother and [Mr. B.]. For these reasons, I conclude the local department has not proven by a preponderance of the evidence that there is "credible evidence, which has not been satisfactorily refuted" that the sexual molestation was caused by [Mr. B.]. COMAR 07.02.07.12 A(2).

> On the other hand, a finding of "ruled out" child sexual abuse can not be made because it [is] impossible to conclude from the evidence that "child abuse did not occur." Primarily this is so because the graphic, detailed nature of the children's statements can not be attributed to any of the

myriad of reasons offered by [Mr. B.] and the children's mother (e.g., PG–13 or R-rated movies, seeing inappropriate items in adult stores or going to Hooters). While it might be possible that viewing of pornographic websites or movies could have given the children sufficient knowledge of the details in their statements, they denied this when they were specifically questioned by Ms. Sims. They were not aware that Ms. Sims would be visiting them at school so it is unlikely that they were coached into denying being told what to say or seeing inappropriate materials. Therefore, the appropriate finding in this matter must be "unsubstantiated" child sexual abuse because there is "insufficient evidence to support a finding of indicated or ruled out child abuse." COMAR 07.02.07.12 B. (E.26–27)

The ALJ's decision was mailed on May 14, 2007. On June 15, 2007, Mr. B. filed a petition for judicial review of the ALJ's decision. Although DSS moved to dismiss the petition as untimely, the circuit court denied the motion without hearing or comment.

In the judicial review proceeding, Mr. B. "argue[d] that DSS did not provide credible evidence to support the ALJ's finding of 'unsubstantiated child sexual abuse' and that the ALJ should have found that child sexual abuse was 'ruled out.'" The court disagreed and affirmed the ALJ's decision in a ten-page memorandum opinion concluding that there was substantial evidence to support the finding that the abuse allegations were "unsubstantiated," based on the children's graphic descriptions of sexual acts that could not reasonably be explained as the product of "coaching" and/or "inappropriate exposure to sexual content by Grandfather," as Mr. B. claimed. After Mr. B. noted this appeal, DSS noted a cross-appeal.

## DISCUSSION

### I.

Under section 07.02.07.12 of the Code of Maryland Regulations ("COMAR"), an investigation of suspected child sexual

abuse must be resolved by one of three dispositions. *See P.F.,* 137 Md.App. at 262–63, 768 A.2d 112.

- First, "[a] finding of indicated child sexual abuse is appropriate if there is credible evidence, which has not been satisfactorily refuted," that a child has been sexually molested or exploited by a household member. COMAR § 07.02.07.12.-A(2)(a). "Physical injury is not required for a finding of indicated sexual abuse." COMAR § 07.02.07.12.A(2)(b).

- Second, "[a] finding of ruled out child abuse is appropriate if child abuse did not occur[,]" a conclusion that "may be based on credible evidence that ... [t]here was no physical or mental injury or, in the case of suspected sexual abuse, no sexual molestation or exploitation[.]" COMAR § 07.02.07.12.C(1).

- And when there is not enough credible evidence to establish by a preponderance of the evidence that sexual abuse either did or did not occur, "[a] finding of unsubstantiated child abuse is appropriate[.]" COMAR § 07.02.07.12.B. "A finding of unsubstantiated may be based, but is not required to be based on," either "[i]nsufficient evidence of a physical or mental injury, sexual molestation, or sexual exploitation" or "[t]he lack of a credible account by the suspected victim or a witness[.]" COMAR § 07.02.07.12.B(1)–(3).

Once a local Department of Social Services has made a finding of "indicated" child sexual abuse, an aggrieved party may ask for a contested case hearing before an administrative law judge, as Mr. B. did in this instance. *See P.F.,* 137 Md.App. at 264, 768 A.2d 112; Md.Code (1984, 2006 Repl.Vol., 2009 Cum.Supp.), § 5–706.1(b)(1) of the Family Law Article ("FL"). This hearing is conducted "in accordance with Title 10, Subsection of the State Government Article" ("SG"), which is the Administrative Procedures Act ("APA"). *See* FL § 5–706.1(b)(1); SG § 10–201 *et seq.*

At the administrative hearing, "[c]hildren younger than 14 years old may not be called to testify by either party," unless the testimony "is essential" and the child will not suffer "emotional harm." COMAR § 07.02.26.12. Moreover, "[e]vi-

dence may not be excluded solely on the basis that it is hearsay." SG § 10–213(c). The ALJ "must 'sift between potentially conflicting information provided by the [local department] and the alleged abuser to determine whether there are sufficient facts to meet the definitions. of' indicated or unsubstantiated abuse." *P.F.*, 137 Md.App. at 264, 768 A.2d 112 (citation omitted).

The ALJ's decision may be challenged by filing a petition for judicial review in circuit court. *See* SG § 10–222(a)(1); COMAR § 07.02.26.14.F; *P.F.*, 137 Md.App. at 264, 768 A.2d 112; Md. Rule 7–202(a). The court's task is to review the administrative record to determine whether a reasoning mind could have reached the same decision as the agency based on the administrative record. *See P.F.*, 137 Md.App. at 264–65, 768 A.2d 112. Although the circuit court's decision may be appealed, the appellate court performs the same task as the circuit court—reviewing the ALJ's decision based on the administrative record. *See id.* at 265, 768 A.2d 112.

The ALJ's factual findings must be affirmed if there is substantial evidence to support them in the administrative record. *See Charles County Dep't of Soc. Servs. v. Vann,* 382 Md. 286, 295, 855 A.2d 313 (2004); *P.F.*, 137 Md.App. at 264–65, 768 A.2d 112. Similarly, in determining whether the ALJ erred in applying the law to the facts, we also apply the substantial evidence test. *See Vann,* 382 Md. at 295, 855 A.2d 313. " 'The test for determining whether the ... findings of fact are supported by substantial evidence is whether reasoning minds could reach the same conclusion from the facts relied upon by the [agency].' " *P.F.*, 137 Md.App. at 264–65, 768 A.2d 112 (citation omitted).

## II.

At the heart of Mr. B.'s appeal are two contentions. First, he asserts that "the ALJ's finding of unsubstantiated child sexual abuse was not supported by credible evidence." In his view, "all of the children's alleged statements were successful-

ly refuted," so that the proper finding was "ruled out." Second, he complains that "the ALJ violated his constitutional rights by allowing the local department to introduce the hearsay testimony of the child victims."

DSS counters that the "unsubstantiated" finding "was supported by credible evidence," that Mr. [B.] did not preserve his hearsay complaint for appellate review, and, in any event, that "the ALJ properly admitted the children's hearsay statements." In its cross-appeal, DSS argues that the circuit court erred in entertaining the petition for judicial review because it was not filed within the thirty day deadline established by Maryland Rule 7–203(a)(2).

We shall begin—and end, as we explain—by addressing DSS's cross-appeal, because it challenges Mr. B.'s right to judicial review of the ALJ's decision.

### Rules Governing Judicial Review of Agency Decisions

The procedures governing judicial review of administrative agency decisions are established in Maryland Rule 7–201 *et seq.* Under Rule 7–203(a), the deadline for filing a petition for judicial review of an ALJ's decision is

30 days after the latest of:

(1) the date of the order or action of which review is sought;

(2) *the date the administrative agency sent notice* of the order or action to the petitioner, *if notice was required by law to be sent* to the petitioner; or

(3) *the date the petitioner received notice* of the agency's order or action, *if notice was required by law to be received* by the petitioner. (Emphasis added.)

Once a party aggrieved by an agency's decision petitions for judicial review, if the agency wishes to participate as a party, it must "file a response to the petition," simply stating its "intent to participate in the action for judicial review." Md. Rule 7–204(a). At the same time, the agency also "may file with the response a preliminary motion addressed to standing, venue, timeliness of filing, or any other matter that would defeat a petitioner's right to judicial review." Md. Rule 7–

204(a)–(b). Nevertheless, "[e]xcept for venue, failure to file a preliminary motion does not constitute a waiver of an issue." Md. Rule 7–204(b).

The administrative record reviewed by the court consists of "the transcript of testimony and all exhibits and other papers filed in the agency proceeding[.]" Md. Rule 7–206(a). Although the agency must file the record within sixty days after it receives a petition for judicial review, it is the party who petitioned for judicial review who must pay for a transcript of the recorded administrative proceeding. *See* Md. Rule 7–206(a)–(c).

Under Maryland Rule 7–207(a), once the court clerk notifies the petitioner and the respondent agency that the administrative record has been filed, the petitioner has thirty days to

file a memorandum setting forth a concise statement of the questions presented for review, a statement of facts material to those questions, and argument on each question, including citations of authority and references to pages of the record and exhibits relied on.

The respondent agency then has "30 days after service of the [petitioner's] memorandum" to "file an answering memorandum in similar form." Md. Rule 7–207(a).

### Mr. B.'s Petition for Judicial Review

As Mr. B. concedes, the Office of Administrative Hearings mailed the ALJ's decision to him on May 14, 2007, as stated next to the ALJ's signature on the decision. The following appeared immediately underneath the mailing date:

### *REVIEW RIGHTS*

This is the final decision of the Department of Human Resources. Any party aggrieved by this decision may file a petition for judicial review with the circuit court ... within thirty (30) days of the date of this decision. Md.Code Ann., State Gov't § 10–222 (Supp.2006); Md. Rules 7–201 through 7–210. The Office of Administrative Hearings is not a party to any review process.

Although the ALJ directed Mr. B. to both the APA and the rules governing his right to obtain judicial review, he did not file his petition for judicial review until thirty-two days later, on June 15, 2007.

DSS argues that subsection (2) of Rule 7–203(a) applies, so that the thirty day period to file his petition for judicial review began on May 14, when the ALJ's decision was mailed, and expired thirty days later, on June 13, 2007. Mr. B. reads the rule differently, maintaining that subsection (3) of the rule applies, so that the thirty day period did not begin to run until he received the ALJ's decision, which he asserts was on June 11, 2007.

We agree with the DSS that subsection (2) of the rule applies and that the thirty day filing period began when the ALJ's decision was mailed on May 14, 2007. The ALJ's decision changing Mr. B.'s responsibility for child sexual abuse from "indicated" to "unsubstantiated" was "subject to appeal ... pursuant to State Government Article, Title 10, Subtitle 2, Annotated Code of Maryland." COMAR § 07.026.14.F. Under SG section 10–221(c) of the APA, the ALJ, as the "final decision maker," was required to "promptly ... deliver *or mail* a copy of the final decision or order to" Mr. B. (Emphasis added.) This is the only notice required by law, and it clearly contemplates notice being complete when the ALJ's decision is mailed. The ALJ's decision indicates this by stating the "Date Decision Mailed" just above a notice of "REVIEW RIGHTS." There is no provision in either the Administrative Procedure Act or the applicable regulations that mandates personal service of the ALJ's decision or otherwise requires some form of notice designed to ensure actual receipt, such as first class mail with return receipt or private delivery service with a person signature by the recipient. Thus, Mr. B.'s petition was not filed within the thirty day filing period.

Under Rule 7–203(a), this deadline has consistently been treated as " 'an absolute statute of limitations, subject to waiver by failure of a respondent to raise the defense in a

proper manner but not subject to discretionary extension[.]' " *Colao v. County Council of Prince George's County*, 346 Md. 342, 364, 697 A.2d 96 (1997). *See Centre Ins. Co. v. J.T.W.*, 397 Md. 71, 78 n. 13, 916 A.2d 235 (2007); *Kim v. Comptroller of the Treasury*, 350 Md. 527, 535–36, 714 A.2d 176 (1998). The Court of Appeals has explained that it deliberately changed the former rule governing judicial review of administrative agency decisions, by eliminating judicial authority to extend the filing period for good cause. *See Colao*, 346 Md. at 361–63, 697 A.2d 96. Because a court may "not allow any implied or equitable exception to be engrafted upon" this thirty day period, "[a] late filing, beyond the period of limitations, of a petition for judicial review cannot be sustained simply because the late filing was the result of a 'clerical error' on the part of a petitioner [or] an attorney for the petitioner[.]" *Id.* at 362–63, 697 A.2d 96.

The Court of Appeals has explicitly recognized that enforcing this deadline in close cases such as Mr. B.'s is difficult, but ultimately necessary.

> Lest this result seem harsh or unfair, it is worth remembering that one of the important goals of the new procedure [for obtaining judicial review of administrative agency decisions] was to make the judicial review process more efficient. The basic battle in these cases is fought at the agency level. Whether acting under an administrative procedures act or under common law principles, the court's role is essentially limited to assuring that the agency acted lawfully, that there was substantial evidence to support its finding, and that it was not arbitrary.... Making the 30-day requirement for filing the petition in the nature of an absolute statute of limitations, subject to waiver by failure of a respondent to raise the defense in a proper manner but not subject to discretionary extension, was in furtherance of that objective[.]

*Id.* at 364, 697 A.2d 96. *Cf. J.T.W.*, 397 Md. at 88, 916 A.2d 235 (holding that the thirty day filing period under Rule 7–203(a) began on the date that the administrative decision was

mailed, so that a petition for judicial review filed six days late was properly dismissed as untimely).

 Hence, the circuit court had no discretion to extend the thirty day deadline under Rule 7–203(a)(2), even by two days. *See id.* The only remaining question is whether DSS waived its right to challenge Mr. B.'s petition for judicial review on untimeliness grounds. We view Mr. B.'s complaint that DSS did not move to dismiss his petition until September 22, 2008, more than fifteen months after he filed it, as a waiver argument. After reviewing the record, however, we are satisfied that DSS did not waive its right to contest the timeliness of Mr. B.'s petition.

As the Court of Appeals has expressly stated, a timeliness challenge to a petition for judicial review may be " 'raised either by preliminary motion under Rule 7–204 *or in the answering memorandum filed pursuant to Rule 7–207.'* " *Id.* at 362, 697 A.2d 96 (quoting Committee Note to Rule 7–203) (emphasis added). Accordingly, even though DSS could have contested Mr. B.'s right to petition for judicial review via a preliminary motion filed with its initial response to that petition, it did not waive that right by failing to do so. *See* Md. Rule 7–204(b); *Colao,* 346 Md. at 362, 697 A.2d 96. Instead, DSS properly asserted its timeliness challenge by filing a motion to dismiss with its answering memorandum. *See Colao,* 346 Md. at 362, 697 A.2d 96.

Although that motion was filed fifteen months after Mr. B. petitioned for judicial review, the record shows that this delay resulted from a series of extensions granted to Mr. B. After the administrative record was filed on August 8, 2007, Mr. B. did not meet his responsibility to pay for a transcript of the recorded hearing before the ALJ, as required by Rule 7–206(a), or otherwise file his memorandum due under Rule 7–207(a), even after the court gave him two extensions of time to do so. DSS moved to dismiss Mr. B.'s petition for judicial review on those grounds, and the court granted that motion on March 19, 2008. Asserting that he had been injured and out of work since July 13, 2007, Mr. B. moved for reconsideration

of the dismissal. On May 22, 2008, the court granted that motion and permitted Mr. B. another sixty days to file the hearing transcript and ninety days to file his memorandum. Mr. B. filed the transcript on July 22, 2008 and his memorandum on August 22. In response, DSS filed its combined motion to dismiss and answering memorandum on September 22, 2008.

Without any hearing or explanation, the circuit court denied DSS's motion to dismiss. We agree with DSS that this was error because the petition was undisputedly filed thirty-two days after the ALJ's decision was mailed, and the lateness of that filing was properly raised as an affirmative defense via DSS's timely motion to dismiss filed with its answering memorandum. *See J.T.W.*, 397 Md. at 88, 916 A.2d 235; *Colao*, 346 Md. at 362–63, 697 A.2d 96.

We must therefore vacate the judgment of the circuit court. To avoid further expense and delay, instead of remanding to the circuit court, we shall exercise our discretion to dismiss Mr. B.'s petition for judicial review as untimely. *See* Md. Rule 8–604(e) ("In reversing or modifying a judgment in whole or in part, the Court may enter an appropriate judgment directly").

■ Although Mr. B. may feel "shortchanged" by our dismissal of his petition on procedural grounds, we observe that, due to the circuit court's error in entertaining it, he has had the benefit of well-reasoned judicial review that, in our view, correctly explained why he is not entitled to the "ruled out" finding that he seeks. Moreover, despite the "cut and dried" basis for our ruling, we have included extensive details from the ALJ's decision that demonstrate thorough consideration of the evidence and proper application of hearsay principles, and also provide Mr. B. with a clear explanation that a finding of "ruled out" was not made because the children's strikingly graphic descriptions of sexual activities were not adequately refuted by Mr. B.'s claims of "coaching" and "inappropriate exposure to sexual content" by Grandfather. Given the contentious relationships and proceedings involving these family members, it is in the children's best interests for Mr. B. to

understand that, even if he had filed his petition for judicial review within the thirty day period, his efforts to obtain a "ruled out" finding would not have succeeded because the "unsubstantiated" finding was supported by the substantial evidence cited in the ALJ's well-reasoned decision.

**JUDGMENT AFFIRMING FINAL DECISION OF ADMINISTRATIVE LAW JUDGE VACATED. PURSUANT TO MD. RULE 8–604(e), APPELLANT'S/CROSS–APPELLEE' S PETITION FOR JUDICIAL REVIEW IS HEREBY DISMISSED. COSTS TO BE PAID BY APPELLANT/CROSS–APPELLEE.**